[Civ. No. 10738. Third Dist. Sept. 29, 1964.]

UNDERWRITERS AT LLOYD'S OF LONDON, Plaintiff and Respondent, v. WILLIAM G. HUNEFELD et al., Defendants and Appellants.

32

Mazzera, Snyder & DeMartini and Robert A. Haughwout for Defendants and Appellants.

Albert E. Cronin, Jr., for Plaintiff and Respondent.

PIERCE, P. J.—Plaintiff, "Underwriters," sought and obtained a declaratory judgment holding their indemnity insurance policy issued to defendants, owners of a drag racing strip, did not, because of exclusions set forth, cover a certain accident causing bodily injuries to one Phillip Gregg.

The policy excludes indemnity for owners' liability for bodily injuries to participants, racing officials, pitmen, mechanics and certain others, *but this exclusion does not apply when such persons are "outside of the racing arena proper and . . . not participating in the actual racing operations in the capacities described."* Also excluded are "accidents occurring in areas known as PIT AREAS."[1]

On evidence, an analysis of which shows no substantial conflict, the trial court found that Gregg at the time of the accident which caused his injuries was within the exclusions of the policy (1) a "Mechanic . . . participating in racing operations" and (2) that this was an accident within the category "accidents occurring in areas known as "PIT AREAS.'" Our interpretation of the policy on these facts compels us to reach the opposite conclusion.

Understanding of the facts and problems will be facilitated by a description of the automobile drag racing premises. The sketch attached, which is a facsimile of part of Defendants' Exhibit "A" (the origin of which will be more fully explained hereinafter) will be an additional aid. [See following page.]

Defendants own what is known as "Kingdon Air Strip" in San Joaquin County. It is used for drag racing. It includes

---

[1] The full provision is as follows:

"5. EXCLUSIONS

The Underwriters shall not be liable under this Policy for:

(c) Claims on account of bodily injury or death to participants and/or Racing Officials and/or pitmen, and/or mechanics and/or owners and/or any member of the Drivers Club or Association furnishing drivers or vehicles during practice or actual racing operations, it being understood, however, that this Exclusion shall not apply when such persons are outside of the racing arena proper and are not participating in the actual racing operations in the capacities described, i.e., whilst said persons are 'spectators' and in the area usually provided for spectators.

"It is further understood and agreed that this Policy does not cover any accidents occurring in areas known as 'PIT AREAS.'"

a racing strip 150 feet (10 lanes) wide and 4,220 feet long, extending north and south. Bleachers for spectators are located on both sides of the track. Also on each side is a parking area for spectators' automobiles adjoining the bleachers. Barriers consisting of posts connected by cables along both sides of the track separate it from the areas just described to the east and west. The track area is divided into four segments which from south to north are a "build up" area 750 feet long where cars await their turn to race, the area between a "preparation line" and a starting line 150

feet long, the racing area 1,320 feet long, and a "slow down area" 2,000 feet long.

On the west side of the track behind the barrier described and at the point of the starting line is a timing stand occupied during the races by the timing officials. It is flanked on the south by a concession stand and on the north by the west-side bleachers mentioned above. Just beyond these bleachers to the north is the west-side parking area.

Participants race against time. After completing a run they proceed along a track called a "return road" westerly and thence southerly along the west boundary of the premises. If work is required to be done on the cars before their next performance, such as tuning up, changing tires, spark plugs, etc., an area formally described as a "pit area" is provided for that purpose. On the attached map it is the area shown by hatched lines in the southwest portion of the premises. Cars which do not require such servicing go to the build-up area awaiting their next turn and sometimes also mingle with spectators' cars in the parking area on the west side of the track. On the day of this accident work was being performed on some of these participating cars so parked.

Persons arriving at the track, usually in automobiles, paid an admission. Payment of a general admission fee would give access to a seat in the bleachers on the east side of the track with adjoining parking. To entitle patrons to go to the west side an additional fee for a so-called "pit pass" was charged. Eligibility for a pit pass was not restricted to participants and personnel connected with racing. *Any spectator desiring to view the race from that side and willing to pay the additional fee could do so, using the west-side bleachers and parking area.*

On April 7, 1957, defendant Phillip Gregg went with his brother to the track in the latter's automobile. His brother was to be a participant; Phillip who knew nothing about drag racing was there only as a spectator. He and his brother bought pit passes and went to the west-side area. The brother engaged in two or three time trials and Phillip watched him, apparently from the west-side bleachers. After each trial the brother drove his car to the west-side parking area.

After the latest of these trials the brother decided to remove the manifold of his engine, purposing thereby to get more acceleration speed. He asked Phillip to assist him by

jacking up the car preliminary to the manifold removal. At that time the vehicle was parked in the west-side parking area with other cars parked alongside on both sides. The front of the car was 10 to 15 feet from and behind the post and cable barricade lining the west side of the track. It was 15 to 20 feet north of the west-side bleachers. With Phillip on his hands and knees preparatory to applying the jack to raise the brother's car, a racing car on the track went out of control, crashed through the described barrier and struck Phillip, pinning him beneath both cars. He was seriously injured.

Phillip brought suit against defendants Hunefeld as owners of the premises, alleging their negligence.[2] This action was commenced during the pendency of that litigation. After the trial court's judgment in the case at bench, plaintiff Underwriters withdrew their defense of the Gregg-Hunefeld action. The Hunefelds then effected a settlement with Gregg.

Important in the interpretation of the policy here involved is the meaning of the phrase "pit area." It is not defined anywhere therein. In explanation of its intended meaning defendants produced as a witness Elmer G. Seemann, an insurance broker. He had obtained the policy under litigation and earlier policies for the Hunefelds and Valley Drag and Auto Racing, Inc. His negotiations were with George S. McDowell of Sacramento, the representative of Underwriters in the area. (His name as Underwriters' authorized representative is in the policy.) Seemann testified that when the first (1955) policy was issued both insurer and insured desired to have the "pit area" fixed, since it was undefined in the policy. McDowell had written to Seemann indicating what should be included. Seemann consulted with Hunefeld and with George Cress, Hunefeld's manager. Seemann took notes based upon his conversations with McDowell, Hunefeld and Cress. These notes and two preliminary sketches are a part of Defendants' Exhibit "A." On one of them is this statement: "In pit area—just sign and keep people out by policing of members of association—" Below this is: "Pit

[2]The Hunefelds did not operate the strip; operation was leased out, at that time to Valley Drag and Auto Racing Inc. It was co-insurer under the policy here in litigation and was named as a codefendant in Gregg's suit but thereafter the suit was dismissed as to it. One of appellants' contentions here on appeal is that the lessee was a necessary party to this litigation not joined. Because of the result which we reach—reversal—decision on that point is unnecessary.

Area. Danger—Keep Out. *Contestants only allowed in this area.*" (Italics supplied.) A letter was then written to McDowell, dated May 7, 1955. It enclosed a map drawn by Seemann. This is the map we have attached. The letter states *inter alia*: "From said map and accompanying comments, I believe you will agree that the pit area will be amply defined, and it will be a matter of enforcement by both the members of the Timing Association and the private patrolmen on duty." There is no evidence of any dissent by McDowell to the map as drawn or to Seemann's observation. The policy in effect when the accident occurred was a later one but all policies after the one negotiated in 1955 were merely extensions thereof and there was never any change of the "pit area" as delineated on the original map. As pointed out, Phillip Gregg was not struck in that area but at a point in the west-side parking area very close to the bleachers. That point is more than a block away from the indicated pit area.

To challenge Seemann's testimony George Cress was called as a witness for plaintiff. On another sketch of the premises (Plaintiff's Exhibit 2) he outlined an area as "pit area" which included *the whole west side of the track from the south end of the premises to the line of the north end of the racing strip extended.* The effect of this seemingly conflicting testimony will be discussed below.

We construe the meaning of the exclusionary provisions of the insurance policy in the light of these facts. ▮ As an aid ·to construction we observe the following complementary rules of law: ". . . An insurance company has the right to limit the coverage of a policy issued by it and when it has done so, the plain language of the limitation must be respected." (*Continental Cas. Co.* v. *Phoenix Constr. Co.*, 46 Cal.2d 423, 432 [296 P.2d 801, 57 A.L.R.2d 914]; *Oakland Stadium* v. *Underwriters at Lloyd's, London,* 152 Cal.App.2d 292, 296 [313 P.2d 602].)

But, as was also stated in *Continental, supra,* at page 437: "It is elementary in insurance law that any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer. [Citations.] If semantically permissible, the contract will be given such construction as will fairly achieve its object of securing indemnity to the insured for the losses to which the insurance relates. [Citation.] If the insurer uses language which is uncertain any reasonable doubt will be resolved against it; if the doubt relates to extent or fact

of coverage, whether as to peril insured against [citations], the amount of liability [citations] or the person or persons protected [citations], the language will be understood in its most inclusive sense, for the benefit of the insured.''

■ We also enlist here another aid to insurance policy interpretation: ''. . . The intent and meaning of the parties is far more important than the strict and literal sense of the words used in the contract. For that reason it is equally important to consider the subject matter of insurance and the purpose or object which the parties had in view at that time; and in addition to these matters, it is often considered proper to consider the business of the parties, the circumstances surrounding the making of the contract, the situation of the property, and all other conditions which have a legitimate bearing upon the intention of the parties.'' (13 Appleman, Insurance Law and Practice, § 7385, pp. 32-33.)

With the latter aid especially in mind we experience little difficulty in this case in determining the coverage actually sought by the insured and the risks intended to be assumed by the insurer. The name given by the witness Seemann, the insurance broker, to describe the policy furnishes a clue. He called it a ''spectators' policy'' as distinguished from the ''participants' policy'' (also written by the same insurer but with greatly limited benefits). ■ The name ''spectators' policy'' itself suggests that coverage intended was indemnity against owner's liability for bodily injuries to spectators from that type of casualty to which a spectator at a racing meet is inevitably exposed—a racing car out of control. A ''participants' policy'' on the other hand seems obviously intended for participants and others connected with racing, covering their injuries from accidents proximately caused (a) by racing, including (b) operations in the pit area as described above.

These being the obvious purposes of the respective policies, in reading the exclusionary clauses we find language making it semantically permissible so to construe them that the policies' objects will not be defeated.

Relating to the clause which states that Underwriters will not be liable for claims on account of bodily injuries ''to participants . . . and/or mechanics . . . it being understood, however, that this Exclusion shall not apply when such persons are outside of the racing arena proper and are not participating in the actual racing operations in the capaci-

ties described, i.e., whilst said persons are 'spectators' and in the area usually provided for spectators,'' three propositions must be considered:

■ Appellants contend that Phillip Gregg cannot be described as a ''mechanic'' because he was totally unskilled in the mechanical mysteries of automobiles. We reject this contention because we believe that, within the intended objectives of this insurance coverage, the important factors are operations performed and the functions of the operators and the degree of proficiency possessed by the actors was unimportant; so that if Phillip, however unskilled as a mechanic, had been performing functions, coverage of which the policy had clearly intended to exclude, lack of liability would follow.

■ But Phillip, when the accident occurred, was not yet ''participating in the actual racing operations'' nor in pit operations incidental thereto. He was not then jacking up his brother's car; that operation had not commenced. He had been a spectator and he was still in an area where spectators circulated freely. If his position on his hands and knees preliminary to the car-jacking operation is uncharacteristic of the ''spectator'' role, nevertheless it was not a maneuver which brought him within the portion of the exclusionary clause just quoted.

■ More important, however, is the fact that neither his position nor what he was about to do had the slightest bearing to increase the risk which the insurer had intended to assume in writing this spectators' policy. That policy was not written to cover only those persons behind the barrier who, alert to the danger of out-of-control racing cars, kept themselves poised to dodge them; it was written to cover all persons—even participants—when not ''participating in the actual racing operations'' for bodily injuries occurring from an accident of the very type which occurred.

The second exclusionary provision: ''this Policy does not cover any accidents occurring in areas known as 'Pɪᴛ Aʀᴇᴀs' '' although a broader exclusion than that discussed above is inapplicable for two reasons.

■ The first is that the area where Phillip was struck was not within the ''pit area.'' As stated above, that phrase was left undefined in the policy. Being undefined, the parties, to clarify their understanding, had caused a map to be drawn which delineated the area intended to be excluded. The map had been submitted and accepted and effectively became a part of the policy itself. Underwriters rely upon the testimony

of George Cress, substantially reported above, in which he expressed the opinion that the point where Phillip was struck was within the "pit area." They argue (citing 3 Witkin, Cal. Procedure, pp. 2245, 2246) that this constitutes substantial evidence and creates a conflict which the trial court was entitled to accept and by which we are bound. The rule is sound, elementary, but as here invoked, inapplicable. As we read the record, Mr. Cress could not have intended his reference to, and delineation at the trial of, "pit area" to refer to anything other than that area for which a so-called "pit pass" must be purchased. We reach this conclusion inevitably because he included within the boundaries outlined substantially the whole of the premises on the west side of the track, embracing therein the concession stand, the timing stand, the spectators' bleachers and the parking area. Acceptance of an interpretation that the west-side bleachers were excluded would deny coverage to anyone sitting therein and constitute, in the policy, a contradiction in terms since participants and other racing personnel while spectating are in the next preceding clause expressly covered. ■ Interpretation, therefore, does not rest upon conflicting explanatory testimony, but upon the policy itself, as amplified by the map—hence there is only a question of law involved, and this is wide open for appellate review.

■ We have noted above that the point where Phillip was struck, although designated and used for parking the cars of west-side spectators, was also being used, at least on the date of the accident, by participants for mechanical operations. Did such sometime-use automatically metamorphize the parking strip into a "pit area" and constitute this an accident "occurring in areas known as 'pit areas'"? Our negative answer to this question is predicated upon two bases: (1) any reasonable interpretation of "areas known as 'pit areas'" as used in the exclusionary clause gives it reference to the areas definite, specified in the policy, delineated by map, specially policed and posted "Danger—Keep Out. Contestants only allowed in this area," i.e., the area exclusively prescribed for mechanical operations and proscribed for spectators. It cannot reasonably be said to have referred to a parking area where all west-side spectators (participants and nonparticipants) parked their cars, and to and from which unrestricted access was allowed. ■ (2) Any reasonable interpretation of "accidents occurring" could not

have reference to accidents of the sort occurring here. Although the briefs have debated the meaning of ''accidents occurring'' in terms of the physical location of the origination point of the casual continuum versus its termination point, the problem is really not one of physical location; it is one of proximate causation, the latter to be considered in terms of risks which the parties intended to cover. Thus neither the origination of the impetus outside the area nor its terminal point within it is necessarily determinative of the policy's scope. But a study of causation in the search for intended coverage will sometimes be (and is here) revelatory. As Justice Cardozo expresses it in *Bird* v. *St. Paul Fire & Marine Ins. Co.,* 224 N.Y. 47 [120 N.E. 86, 13 A.L.R. 875, 877]: ''The same cause producing the same effect may be proximate or remote as the contract of the parties seems to place it in light or shadow.''

Here, when we consider the proximate cause of this accident in connection with the objectives of this policy—the risks intended to be covered and those intended to be excluded—enlightenment occurs. That cause—a car out of control hurtling through a barrier and hitting a person then occupying the status of spectator—was exactly the risk intended to be covered. And it made not the slightest difference in terms of proximate causation whether the victim was sitting in the bleachers or was 15 or 20 feet away therefrom and in the area described. Nor was the nature or extent of the insurer's risk increased in any degree whatever by the happenstance of the victim's position.

We hold, therefore, that coverage was intended, that neither the victim's position, nor his status as a potential ''mechanic,'' nor place of impact had any effect upon the quantum of accepted risk; the exclusionary clauses were inapplicable; this policy indemnified the defendants Hunefeld against liability for the accident occurring.

The judgment is reversed and the cause remanded to the trial court with directions to enter judgment in favor of appellants in accordance with the views expressed herein.

Friedman, J., and Moor, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.