[Civ. No. 568.   Fifth Dist.   Apr. 28, 1966.]

FRED BENTON et al., Plaintiffs and Appellants, v. THE
     AETNA CASUALTY AND SURETY COMPANY, De-
     fendant and Respondent.

Ben Curry for Plaintiffs and Appellants.

McCormick, Barstow, Sheppard, Coyle & Best and Hollis G. Best for Defendant and Respondent.

CONLEY, P. J.—One of the plaintiffs, Fred Benton, was engaged at the time specified in the complaint in the performance of various contracts involving earth-moving in the construction, principally, of roads and dams. He was associated in this work, in the manner afterwards discussed, with Fred Galante of Visalia. In the course of the construction of a dam in foothill territory, one of the workmen negligently started a fire; he did not succeed in extinguishing it, and the blaze spread to neighboring lands causing damages in the following amounts: To R. E. Southward and Gladys Southward the sum of $7,700; to K. C. Barlow, Inc. $5,600; to K. C. Barlow, individually, $1,750, and to Maud G. Ivers $350. All of these persons brought suit against Mr. Benton in Mariposa County and, by consent, got judgment against him for their damages.

Thereafter, Mr. Benton and the enumerated parties brought the current action as coplaintiffs against The Aetna Casualty and Surety Company, a corporation (hereinafter sometimes referred to as Aetna), and Edward G. Leap, its Merced general agent, claiming that they were entitled to recover against the surety company, or in the alternative against Mr. Leap, by virtue of a policy of insurance, which had been issued to Mr. Benton and which was in effect at the time of the fire. The plaintiffs claim that the policy insured Benton against any liability up to the sum of $25,000, which might arise in favor of any one who sustained property damage as the result of operation by him of earth-moving machinery; secondly, on the separate theory that Mr. Leap was liable on an oral contract to insure Mr. Benton; and, thirdly, that the issued policy was effective because the defendants should be estopped to deny that Benton was insured for the risks involved. By the prayer, the plaintiffs, damaged by the fire, asked for a judgment in the amounts above specified and further stated that, if the policy

as issued was not formally sufficient, it should be reformed so as to extend the coverage as actually contracted for.

The case was tried by the court without a jury; at the beginning of the trial, the action against Mr. Leap was dismissed upon motion of his attorney without opposition, and actually with the consent of counsel for the plaintiffs; after the evidence was heard the court determined by its findings and judgment that the Aetna Casualty and Surety Company should not be required to pay anything to any of the parties; that the terms of the policy were such that no coverage for the loss sustained was afforded to Mr. Benton in view of the actual facts relative to his employment of the workman and his association with Mr. Galante.

The court found that Benton had entered into a contract of insurance with Aetna (policy No. 5PS2599), which was in effect at the time of the fire; that the policy provided "property damage liability coverage with respect to operations performed by FRED BENTON by *independent contractors and general supervision thereof by* FRED BENTON" (italics added); that the policy excluded coverage with respect to any act or omission of Fred Benton or any of his employees other than general supervision by Benton of work performed for him by independent contractors; that the losses of the plaintiffs whose properties were damaged by the fire were not caused by operations performed for Benton by an independent contractor and did not arise out of his general supervision of an independent contractor. It was also found that no oral contract of insurance was entered into between Benton and Aetna; that there was no negligence on the part of Leap, and that Leap did not make misrepresentations regarding the coverage of the policy; that there was ". . . no conduct on the part of the defendant, Aetna, its agents or representatives, which would estop said defendant, AETNA from denying coverage under said policy . . ."; and that there was no waiver of its defenses under the policy. Additional findings of fact were made pursuant to plaintiffs' formal request as follows:

1) That Mr. Leap knew at the time of delivering the policy to Benton that it contained the express exclusions with respect to any act or omission of Benton or his employees other than general supervision by Benton of work performed for him by independent contractors;

2) That Benton and Leap had discussed Benton's method of operating his business prior to the issuance of the policy; and

3) That at the time of furnishing the policy, Leap "believed that the business operations" of Benton were "probably excluded from coverage by the express exclusions of the policy and so informed FRED BENTON and urged him to get a different policy of insurance and to obtain advice of an attorney on the questions of coverage."

The judgment generally followed the findings.

Plaintiffs moved for a new trial; it was deemed denied by the expiration of the time within which a ruling could be made by the court, and the plaintiffs appealed.

Appellants base their request for reversal upon three grounds: they first say that the findings are not supported by the evidence; secondly, they argue that the request for the reformation of the contract should have been granted because the company understood what coverage was desired by Benton and it intended to furnish such coverage but failed to do so; thirdly, they urge that when a client informs an insurance company's agent what coverage he desires, and the agent knows or strongly suspects that the policy as issued will not provide such coverage, the company, as a matter of law, waives the provisions that would limit the coverage and is estopped to raise the defenses furnished by a literate construction of the policy.

The plaintiff Benton testified that he had been in the contracting business since April of 1947. He had carried insurance with Mr. Leap of the kind shown by the present policy at a premium of $22 per annum for one or more years prior to 1958. His wife telephoned to the Leap agency asking for a renewal of the policy, and Mr. Leap then forwarded an Aetna policy to him, somewhat broader in coverage, but not so all-inclusive as a comprehensive policy; the premium requested was $44, rather than the $22 previously paid. Benton went to Leap's office and carried on a discussion with him for about 45 minutes with respect to the insurance which was required. At that time, they talked over the nature of Benton's business operations. The policy, issued to Benton as the result of the conversation, provided protection for him only as sole owner of the business, and on the assumption that he had no operating employees, but subcontracted all of his jobs. Upon the basis of the facts as then stated by Benton, it would seem that Leap would be justified in concluding that the limited contractor's policy was adequate. However, Leap advised Benton that he thought that his relationship with Galante was somewhat doubtful and suggested that Benton should request a compre-

hensive liability policy, more extensive in scope than the $22 or even the $44 policy, which would insure against all potential hazards; he also suggested that Benton consult an attorney about his relationship with Galante and the appropriate policy coverage. Mr. Benton refused to buy comprehensive insurance, and he did not consult an attorney; he represented, and perhaps believed at that time, that Galante was a subcontractor. He insisted upon delivery of the $22 limited contractor's policy. Mr. Benton admitted on the stand that he was under no apprehension that this was a comprehensive policy.

Unfortunately for plaintiffs' contention, basic representations which Benton made to Leap, as later events and the present viewpoint of Benton demonstrate, were clearly wrong. He took the position which he now asserts when he agreed to a consent judgment, in the Mariposa litigation, in favor of the other present plaintiffs; he there admitted that the workman who negligently set the fire and permitted it to escape was his own employee. He cannot, therefore, quarrel with the conclusion reached by the trial court that, innocently or otherwise, he misrepresented the true facts to Mr. Leap at the time the present policy was issued.

■ On appeal, we are faced with a situation in which essential facts were misstated by Mr. Benton to Mr. Leap with an insistent request that Aetna issue a policy covering the insurance needs of the contractor on the basis of such a false representation. While Leap had doubts as to whether the policy properly covered the economic factors which existed, and so informed Benton by suggesting that he get a comprehensive policy at a considerably advanced rate and that he consult an attorney, Mr. Leap nevertheless was persuaded that Benton had correctly informed him and concluded that the policy in question would meet Benton's needs notwithstanding the persistence of his doubts. In any event, there was no fraud on the part of the defendants, and no misinformation came from either of them. Mr. Benton himself was responsible for the misinformation.

As to the second and third points, plaintiffs contend that Leap knew what coverage Benton was seeking, and it would have been fraudulent on his part to furnish the policy and accept the premiums if he knew that no coverage would be furnished for the anticipated risk. But the insurance policy as issued did in fact cover the risk as it was then represented by Mr. Benton, and it should be noted also that if at any time during his operations he had changed his business relationship

so that Mr. Galante or his successor would have become solely a subcontractor, the policy would have been applicable and fully effective.

Appellants argue that Leap was trying to supply coverage to Benton for the type of operation which caused the fire, and that Leap suspected that the Aetna policy would not furnish this protection; they contend that there were means available to Leap, which he should have used, to find out if the company would give the desired coverage by contacting the head office or district quarters of Aetna, and that consequently his failure to act was negligence; we cannot accept this contention as creating liability in view of the evidence and the findings.

Many rules relative to the issuance of insurance policies are referred to in appellants' brief, which cannot be questioned in their generality. For example, *Beach* v. *United States Fid. & Guar. Co.*, 205 Cal.App.2d 409 [23 Cal.Rptr. 73], correctly states that knowledge acquired by a general agent is knowledge of the insurance company. *Underwriters at Lloyd's of London* v. *Hunefeld*, 230 Cal.App.2d 31 [40 Cal.Rptr. 659], holds that in a proper case the intent of the parties, with respect to coverage, controls over the written terms of a policy actually issued. And *Wildman* v. *Government Employees' Ins. Co.*, 48 Cal.2d 31, 35-36 [307 P.2d 359], stands for the principles: (a) that ambiguity in an insurance policy must be resolved against the insurer, (b) that an insurance contract will be construed to achieve its object of securing indemnity to the insured for the losses to which the insurance relates, and (c) that reasonable doubt as to the phraseology of the policy provisions or other matters involved by an insurance controversy will be resolved against the insurer. But citations of this kind, while generally sound, scarcely constitute persuasive authority here as to the main question involved.

Appellants cite *Modica* v. *Hartford Acc. & Indem. Co.*, 236 Cal.App.2d 588 [46 Cal.Rptr. 158], for the premise that where all of the facts are freely made known by an applicant, and the insurance agent appreciates the risk the client believes is being covered, the policy should be reformed to conform with the actual contract.

Appellants also correctly state that if a policy is issued by an insurer having full knowledge of facts which would vitiate the insurance according to its terms, there is a waiver of any such defenses. (See 27 Cal.Jur.2d, Insurance, § 317, p. 821; *Loring* v. *Dutchess Ins. Co.*, 1 Cal.App. 186 [81 P. 1025]; *Capital Glenn Min. Co.* v. *Industrial Acc. Com.*, 124 Cal.App.

79 [12 P.2d 122].) In the *Loring* case the court held that where the true facts were known to the agent, the insurer was bound even though there was an express condition in the policy that the applicant was the *sole owner in fee* of the property destroyed when in fact he had taken the title in the name of another as security.

Appellants also argue that not only did Aetna permanently retain all premiums for the policies already mentioned, but that for two years after the fire it issued new $22 policies to Benton, cancelling the last policy only after the denial of liability in the present case. ▮ But estoppel is not applicable here where the issuance of the policy was based upon facts misstated by the insured. ▮ As the policy was in fact effective as to the risk actually covered by it, the premiums were properly retained.

In 16 Appelman, Insurance Law and Practice, chapter 319, Waiver or Estoppel by Agent, section 9121, page 654, it is correctly said: "Each case regarding the question of whether an insurer, through acts of its agent, has waived or become estopped from enforcing a condition of a policy, must stand on its own bottom and be decided on its own peculiar merits, . . ." It would be an impossible burden upon insurance companies to hold their agents to the high standards of legal experts so that they would have to make an unerring evaluation of every policy, even if the facts were misstated to them and no contrary facts were known by them. In this case, Benton apparently did not know what his legal relationship with Galante was when he insisted on the issuance of the $22 policy; another possible viewpoint would be that he deliberately and fraudulently misstated that he had no employees and that he was the sole owner of the business; however, we do not accept this alternative, believing that Mr. Benton made an honest mistake. But mistake it was, in any event. And Mr. Leap did not know any more than Benton, but, on the contrary, reasonably accepted Benton's statement and acceded to his demand to issue the policy, even though his doubt persisted.

In this case, we do not have a situation such as develops in some litigation when a person wishing to be insured appears before an insurance agent and fully and correctly states all of the facts, and requests the agent to furnish him with the necessary coverage. Here the essential facts with respect to the relationship of Benton and Galante were misstated by the applicant for insurance. Instead of saying at that time, as he

does now, that the workmen were his employees and that they could be, and were, "hired and fired" by him, he said that he had no employees. Furthermore, he represented that he alone conducted the business, whereas, it now appears that he was a partner or joint venturer with Mr. Galante; the earth-moving equipment was supplied by Galante and Benton employed the workmen, even though the bookkeeping relative to them was carried on by Galante. After a job was completed, the expenses of gasoline, oil and minor repairs were first paid and the balance was divided 80 percent to Mr. Galante and 20 percent to Mr. Benton. This certainly was not a business carried on by Benton as a sole proprietor.

An insurance company should not be required to act as judge of the true coverage possibilities when the facts are misstated by the applicant and are unknown to the company and a policy of a given type is insisted upon by the insured. We cannot interfere with the conclusions reached by the trial court in view of the fact that its findings are supported by substantial evidence.

The judgment is affirmed.

Stone, J., concurred.