[Civ. No. 11103. Third Dist. June 22, 1966.]

DOROTHEA M. O'DOAN, as Administratrix, etc., et al., Plaintiffs and Appellants, v. INSURANCE COMPANY OF NORTH AMERICA et al., Defendants and Respondents.

72

Gale & Goldstein and Lawrence M. Goldstein for Plaintiffs and Appellants.

McGregor, Bullen & Erich and Donald M. McGregor for Defendants and Respondents.

FRIEDMAN, Acting P. J.—This is a suit on an insurance policy claimed to cover the accidental death of plaintiffs' decedent, Theodore O'Doan, Jr. Mr. O'Doan suffered fatal injuries in the course of his employment as a test technician at a rocket and missile testing facility operated by Douglas Aircraft Company, Inc.

Douglas Aircraft had entered into a collective bargaining agreement with a union of which O'Doan was a member. The agreement required Douglas to cover the affected employees with accidental injury and death insurance beyond standard workmen's compensation benefits. Douglas Aircraft accordingly purchased an insurance policy from Insurance Company of North America, which (after deletion of phraseology not affecting the issue) contained the following statement of insured hazards: "Loss as covered under this policy sustained by the insured person occurring while this policy is in force . . . provided such loss is sustained while any insured person is in the course of employment for the named insured in the connection with missile and/or rocket work, components thereof or the development of any of these items, which loss is directly caused by the firing, misfiring, explosion or malfunction of rockets, missiles, or their respective fueling systems or

any related accident." This statement paralleled the description of coverage specified by the collective bargaining agreement.

After O'Doan's injury and death the insurance carrier took the position that the accident was excluded from coverage, being outside the category of "loss . . . directly caused by the firing, misfiring, explosion or malfunction of rockets, missiles, or their respective fueling systems or any related accident." After a nonjury trial the court entered findings and judgment sustaining that position. Plaintiffs' appeal poses the necessity of interpreting the quoted policy language. Just as the advent of the space age evoked this particular insurance coverage, so the exigencies of space age testing have evoked a description of risks not yet tested by the venerable techniques of judicial interpretation.

At the time of the accident O'Doan was working at a test stand or tower designed for static firing of a captive rocket or missile. One of the upper stages of a multi-stage rocket was the subject of the testing at that particular test stand. The rocket stage had six motors. In actual flight, it would be fired in the vacuum or near-vacuum of the upper atmosphere. The rocket motors were mounted approximately 40 feet above the concrete deck of the test stand. From the base of each motor a vertical diffuser tube extended downward approximately 32 feet. Each tube had a diameter varying between perhaps three and four feet. The bottom of the tube was approximately $7\frac{1}{2}$ feet above the deck. The tubes were an adjunct of the testing technique, not components of the rocket itself. For test purposes, however, the tubes were firmly affixed to the rocket motors. One purpose of the tubes was to create a vacuum or near-vacuum during test firing, thus simulating actual flight conditions.

On June 29, 1962, 11 days before O'Doan's accident, the rocket engine was subjected to a "chill" test involving the introduction of liquid oxygen into the engine at subzero temperatures. Each of several runs encountered some mechanical difficulty and had to be terminated or, in space parlance, "aborted" before completion. (The parties agree that these mechanical difficulties constituted a *malfunction* within the meaning of the insurance policy. They disagree on the question of causal relationship between the malfunction and O'Doan's accident.)

Eleven days later, on July 10, O'Doan and a companion were checking the alignment of the diffuser tubes and rocket motors and correcting any misalignment. In order to create

acceptable firing conditions for future tests each tube had to be centered precisely under the rocket motor. There was evidence that the extreme cold of liquid oxygen causes contractions of the metal, thus changing the alignment of the motors and diffuser tubes. In order to perform the alignment operation, O'Doan had to mount a stepladder extending upward into the interior of each diffuser tube and to take measurements as he climbed upward. During this operation he wore a respiratory mask as a protection against any vestiges of lethal gas and against lack of oxygen inside the diffuser tubes. While O'Doan was on the ladder inside one of the diffuser tubes, he fell and landed on the concrete deck, suffering the injuries from which he died. The precise cause of his fall is unknown.

The trial court found that the diffuser tube was not part of a live missile or rocket; that at no time preceding the injury had the captive rocket on which O'Doan was working ever been fired; that O'Doan's death did not result *directly or otherwise* from a firing, misfiring or explosion of the rocket; that although the rocket had "malfunctioned" during the chill test on June 29, the malfunctions did not create the necessity of realigning the rocket motors and diffuser tubes; rather, that the realignment was necessitated as the natural result of subzero liquid oxygen used in the chill test; that O'Doan's injury did not result *directly or otherwise* from the malfunctions of June 29; that the *related accident* phrase of the policy applied to losses which were proximately (although not necessarily directly) caused by the firing, misfiring, explosion or malfunction of rockets; that O'Doan's injury was not in any way caused by an accident related to the firing, misfiring, explosion or malfunction of the rocket or its fuel system; that at the time of O'Doan's accident on July 10 no testing of any kind was in process, the rocket was not operating or functioning and there was no fuel aboard.

 These findings are compounded partly of factual conclusions drawn from the evidence and, in part, of declarations which are really interpretations of the coverage provision of the policy. Plaintiffs attack these findings on appeal. To the extent that plaintiffs' attack is directed against facts found to be true by the trial court, it is of course met by the substantial evidence rule. Findings of a factual nature are that there had never been any firing, misfiring, or explosion of the rocket or its fuel system; that a malfunction of the rocket had occurred during the chill test of June 29 but this malfunction did not

create the necessity for the realignment work in which O'Doan was engaged on July 10; that the realignment was the natural result of the subzero liquid oxygen used in the chill test. There is no significant conflict in the evidence, which fully supports these findings; hence plaintiffs are precluded on appeal from claiming coverage on the theory that the fatal injuries were caused by firing, misfiring, explosion or malfunction.

Plaintiffs are thus confined to the theory that O'Doan's injuries were caused by a *related accident*. At this point they seek to overthrow findings which are not true findings of fact, but trial court interpretations of the coverage provision of the policy and of the parallel provision in the collective bargaining agreement. ▮ There is no extrinsic evidence of the parties' intent in drafting the statement of insured hazards. Thus interpretation of the statement is a question of law and this court is free to reach its own interpretation without regard to trial court interpretations, even though drafted as findings of fact. (*Prickett* v. *Royal Ins. Co., Ltd.*, 56 Cal.2d 234, 237 [14 Cal.Rptr. 675, 363 P.2d 907, 86 A.L.R.2d 711]; *Jarrett* v. *Allstate Ins. Co.*, 209 Cal.App.2d 804, 810 [26 Cal.Rptr. 231].)

Whether O'Doan's fatal injuries were within the *related accident* phrase entails interpretation of the policy's coverage provision. The phrase appears to be a novel one in insurance terminology. At least counsel have not referred the court to existing judicial definitions, nor has research disclosed any.

The interpretive problem may be approached from several directions, but the causation element pervades them all. One approach inquires first whether the policy provision is "clear" or "ambiguous" in relation to the particular injury-producing event. Another method accepts the presence of ambiguity but considers the relative parts of the policy as evidence of the parties' intent to include or exclude particular causal sources of injury. Another may accept the existence of a covered peril and turn directly to the question of causality. In *Underwriters at Lloyd's of London* v. *Hunefeld*, 230 Cal. App.2d 31, 42 [40 Cal.Rptr. 659], Presiding Justice Pierce of this court noted that analysis of causation often illuminates the search for intended coverage, quoting Justice Cardozo in *Bird* v. *St. Paul Fire & Marine Ins. Co.*, 224 N.Y. 47, 51 [120 N.E. 86, 87, 13 A.L.R. 875, 877]: " 'The same cause producing the same effect may be proximate or remote as the contract of the parties seems to place it in light or shadow.' " (See also

Brewer, *Concurrent Causation in Insurance Contracts,* 59 Mich.L.Rev. 1141, esp. at pp. 1170-1174.)

Pertinent rules of interpretation are simple enough. If the policy language is clear, the contract must be given effect as executed by the parties. (*Jensen* v. *Traders & General Ins. Co.,* 52 Cal.2d 786, 790-791 [345 P.2d 1].) If the language is ambiguous, any reasonable doubt will be resolved against the insurance carrier. (*Continental Cas. Co.* v. *Phoenix Constr. Co.,* 46 Cal.2d 423, 437-438 [296 P.2d 801, 57 A.L.R.2d 914].) The rule of construction against the insurer may not be invoked when the policy is clear. (*Baine* v. *Continental Assur. Co.,* 21 Cal.2d 1, 5 [129 P.2d 396, 142 A.L.R. 1253]; 1 Couch on Insurance (2d ed.) § 15:82, p. 820.) A policy provision is ambiguous only when, on its face, it is capable of two different constructions, both of which are reasonable. (*Jarrett* v. *Allstate Ins. Co., supra,* 209 Cal.App.2d at p. 810; *Bonfils* v. *Pacific Auto. Ins. Co.,* 165 Cal.App.2d 152, 159 [331 P.2d 766]; see *Woodbine* v. *Van Horn,* 29 Cal.2d 95, 104 [173 P.2d 17].) No term of a policy is ambiguous if its meaning can be ascertained by fair inference from the remaining terms. (*Burr* v. *Western States Life Ins. Co.,* 211 Cal. 568, 576 [296 P. 273]; *McMillan* v. *State Farm Ins. Co.,* 211 Cal.App.2d 58, 62-63 [27 Cal.Rpt. 125].)

The initial objective, a decision whether the provision is clear or ambiguous, is frequently more elusive than the resolution of ambiguities. The provision will shift between clarity and ambiguity with changes in the event at hand. The coverage provision of the present policy would be clear in relation to an injury caused by the direct force of an exploding rocket, but ambiguous relative to some more doubtful event.

We have concluded that the coverage provision is clear, because the phrase *related accident,* when viewed in company with the policy's surrounding terms, is not reasonably capable of embracing the injury-producing event. The coverage provision commences with the mention of *loss,* a term which refers to the injury or damage. (*Jarrett* v. *Allstate Ins. Co., supra,* 209 Cal.App.2d at pp. 811-812.) This loss, the policy declares, must be directly caused by one of four enumerated perils or by *any related accident.* The enumerated perils are the firing, misfiring, explosion or malfunction of a rocket, missile or its fuel system. The term *accident* denotes an unintended casualty. (*Richards* v. *Travelers Ins. Co.,* 89 Cal. 170, 176 [26 P. 762, 23 Am.St.Rep 455]; 10 Couch on Insurance (2d ed.) § 41:7, p. 29.) The term *related* demands

that the injury-producing mishap stand in a relationship, that it possess a connection or kinship with one of these perils. In the context of a catalog of injury-producing events, the term *related* fairly denotes a causal connection, although possibly it may also embrace the notion of similarity. Either way, O'Doan's fall or whatever force or mishap was the immediate cause of his fall constituted an *accident,* but not one *related* to any of the enumerated perils. It was neither a result of, nor had it any similarity of nature or appearance to the latter. No firing, misfiring or explosion of the mechanism had ever occurred. Malfunctions had indeed occurred, but the trial court found that these had not caused (i.e., were not related to) the misalignment on which O'Doan was working. Thus the accident, the fall from the ladder, was not causally related to any of the four enumerated perils.

That the realignment work was preparatory to a future firing of the rocket does, to be sure, create an arguable and tenuous relationship. The future firing was a remote event in the network of causation and its sequential relationship to the accident was broken by an intervening, dominating force— whatever it was—which caused O'Doan to fall from the ladder (see Ins. Code, § 530). The term *related accident* is not reasonably capable of extension to include the injury-producing event and is thus free from ambiguity. The policy, as written, does not cover O'Doan's accident.

In ascribing a causal allusion to *related accident,* we do not overlook the presence of the phrase *directly caused* which precedes it. "Directly caused" is fairly synonymous with "proximately caused." (*Gulf Portland Cement Co.* v. *Globe Indem. Co.,* 149 F.2d 196; *Dixie Pine Products Co.* v. *Maryland Cas. Co.,* 133 F.2d 583, 585; *Ward* v. *Read,* 219 Cal. 65, 70 [25 P.2d 821]; *Weaver* v. *Landis,* 66 Cal.App. 2d 34, 39 [151 P.2d 884]; 10 Couch on Insurance (2d ed.) § 42:65, p. 730.) Arguably, the demand for direct or proximate causation engulfs the causal element indirectly implied by the word *related.* There may be cases in which the *related accident* phrase transports a cause of injury, otherwise excluded, within the sphere of coverage. No such problem confronts the court here, since O'Doan's accident was so far removed from either firing or malfunction that it cannot be reasonably regarded as an event *related* to either.

The courts frequently declare that accomplishment of the parties' intent is the objective of policy interpretation. (See *Baine* v. *Continental Assur. Co., supra,* 21 Cal.2d at p. 5;

*Ogburn* v. *Travelers Ins. Co.*, 207 Cal. 50, 52 [276 P. 1004].)

█ █ While the terms of the policy are the best evidence of intent, the present policy was purchased in response to a collective bargaining contract, whose description of the desired coverage paralleled the policy's. It is evident that the parties intended to furnish employees financial protection against accidents beyond that supplied by workmen's compensation because of extreme hazards surrounding the active testing and firing of captive rockets. Exclusion of the present accident, which occurred in the course of preparing the static mechanism for future firing, appears to be consistent with that intention.

Judgment affirmed.

Regan, J., and White, J. pro tem.,* concurred.

A petition for a rehearing was denied July 19, 1966, and appellants' petition for a hearing by the Supreme Court was denied August 17, 1966. Peters, J., and Peek, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairman of the Judicial Council.