508 P.2d 588

**MOUNTAIN STATES MUTUAL CASUALTY COMPANY, Plaintiff-Appellant,**

**v.**

**NORTHEASTERN NEW MEXICO FAIR ASSOCIATION, a private corporation, Defendant-Appellee.**

**No. 9539.**

Supreme Court of New Mexico.

April 6, 1973.

Modrall, Sperling, Roehl, Harris & Sisk, James A. Parker, Albuquerque, for plaintiff-appellant.

Sommer, Lawler & Scheuer, Santa Fe, for defendant-appellee.

## OPINION

OMAN, Justice.

This is a suit by plaintiff for a declaration of the rights of the parties under a general liability policy of insurance issued by plaintiff to defendant. Plaintiff appeals from a summary judgment entered in favor of defendant. We affirm.

Defendant operates a horse racetrack known as La Mesa Park. During the early morning hours of July 14, 1968, a jockey by the name of Louis Sisneros was exercising a race horse named Vic & Vinegar. He was exercising this horse pursuant to an arrangement with the horse's trainer whereby he [Sisneros] would exercise horses by galloping them for a fee of $2.00 if they were two year olds, and $1.00 if they were over two years old. This was a standard fee paid to either a jockey or an exercise boy for this service.

Vic & Vinegar was not going to race on July 14, 1968, and she had never been ridden by Sisneros in a race. Sisneros was scheduled to ride other horses in races later in the day of July 14, 1968. However, he did not do so because he was thrown that morning by Vic & Vinegar when attacked by dogs which in some way gained entrance to the track. Sisneros suffered injuries which allegedly caused his death on July 4, 1970.

Suit was filed after his death by his representative against defendant for the injuries he sustained and for his claimed wrongful death. Defendant demanded that plaintiff, as defendant's insurer, defend the tort action on behalf of defendant, but plaintiff declined and brought the present declaratory judgment suit.

Defendant was granted a summary judgment by which the trial court held plaintiff obliged under the policy to defend the tort action on behalf of defendant and to pay and discharge any judgment recovered against defendant therein to the extent of the limits of the coverage under the policy.

The policy contains an athletic participants exclusion which provides in pertinent part:

"It is agreed that with respect to operations described above or designated in the policy as subject to this endorsement, the *insurance does not apply to bodily injury to any person while practicing for or participating in any contest or exhibition of an athletic or sports nature sponsored by the named insured.*" [Emphasis added]

Unquestionably, the principal purpose for exercising Vic & Vinegar by galloping her was to keep her in condition for racing. The question here, however, is whether Sisneros by riding her for this purpose was himself practicing as a jockey for the purpose of riding in horse races at La Mesa Park.

Plaintiff relies upon the testimony of the trainer of Vic & Vinegar as the basis for its claim that a genuine issue of fact was presented as to whether Sisneros by exercising her was practicing for a contest or exhibition of an athletic nature, to wit, to ride as a jockey in races at La Mesa Park.

This witness testified as to the following four reasons why a jockey would exercise and gallop race horses on defendant's track: (1) so that the jockey could maintain his physical fitness and riding skills; (2) so that the jockey could become familiar with the characteristics of the horse that he was exercising or galloping; (3) so that the trainer of a horse would give the jockey more consideration for riding a mount in a race if the jockey helped with exercising; (4) for the compensation paid the jockey by the trainer for exercising and galloping horses.

Although not all of this witness's testimony as to why a jockey might exercise horses, his testimony pertinent to the question as to why Sisneros was exercising Vic & Vinegar on July 14, 1968 was as follows:

"Q. When you mention a jockey riding a horse for his own benefit are you saying that he is staying in physical condition?

"A. A little bit of it, yes, it helps to keep them fit, you bet.

"Q. Is that all you meant, that it keeps them in physical condition for riding?

"A. A jock?

"Q. Yes.

"A. Yes.

"Q. Did you mean anything other than that?

"A. No.

"Q. A jockey already knows how to ride, does he not?

"A. Yes."

" * * * *

"Q. All right. Now in this particular case, since Louis Sisneros was not riding the horse—he was not riding him[sic] on this morning for the purpose of learning about that horse for the afternoon, was he?

"A. No, sir."

" * * * *

"Q. Now since Louis Sisneros was not scheduled to be a jockey for Vic and Vinegar he was not exercising her on that day in order to learn her characteristics, was he?

"A. No, he loped her before.

"Q. What's that?

"A. He rode her before in the mornings.

"Q. He'd ridden her before in the mornings?

"A. Yes.

"Q. But on this particular morning and on the other mornings when he was riding her, he was not at that time getting used to that horse so that he would be the jockey, was he?

"A. No."

" * * * *

"Q. Was she going to run on July 14th?

"A. No."

" * * * *

"Q. Do you know whether Louis Sisneros was scheduled to ride as a jockey in a race on the afternoon of July 14th?

"A. Yes. Let's see, wait a moment, the day he got hurt, I guess he got hurt —this was on a Sunday, if July 14th is on a Sunday, he was supposed to ride that afternoon, yes, because some of his horses won, I don't know which horses but I remember him talking about it later."

" * * * *

"Q. All right. We have established by looking at a calendar that July 14, 1968, was a Sunday so it is now your recollection that Louis Sisneros was scheduled to ride as a jockey in races that afternoon, is that right?

"A. Yes." .

" * * * *

"Q. Vic and Vinegar was not scheduled to race on this particular day?

"A. Right."

" * * * *

"Q. Do you know whether he acted as a jockey for Vic and Vinegar at Sunland?

"A.  No.

"Q.  He had not?

"A.  No.

"Q.  Your answer is he had not acted as a jockey?

"A.  He had not."

"*  *  *  *

"Q.  Now as I understand it, regardless of what we call him, jockey or exercise boy, you would pay him two dollars or one dollar for exercising horses?

"A.  Yes, sir.

"Q.  Is that right?

"A.  Yes, sir."

"*  *  *  *

"Q.  He was riding simply for the compensation which he was receiving, is that right?

"A.  Yes, two dollars.

"Q.  You have no recollection of whether or not Louis Sisneros had ever ridden Vic and Vinegar in a race, have you?

"A.  I don't think that he had."

Unquestionably the testimony supports plaintiff's contention that exercising horses in the manner in which Sisneros was exercising Vic & Vinegar at the time of the accident helps a jockey to maintain his physical fitness. But this fact does not by itself resolve the issue before us.

■■■ Reference to any standard dictionary shows a great number of definitions of the word "practice." The definition of any word or term, unless it has a very limited and precise meaning, must be construed in the light of the context in which it is used. Otherwise, it lacks real significance in communication, and particularly does it lack the precision of meaning necessary to effect a meeting of minds in order to create a contract. This should be particularly true as to insurance contracts in which so many of the terms and provisions are rather general in meaning, and are so little understood and so difficult of understanding by the ordinary insured. Because of their difficulty in being under-

stood, because the insurers author them, and because they do so often include terms and provisions which may reasonably be understood in more than one way, policies of insurance are generally construed liberally in favor of the insured and strictly against the insurer. Couey v. National Benefit Life Insurance Company, 77 N.M. 512, 424 P.2d 793 (1967); Foundation Reserve Insurance Co. v. McCarthy, 77 N.M. 118, 419 P.2d 963 (1966). See also Ivy Nelson Grain Co. v. Commercial U. Ins. Co. of N. Y., 80 N.M. 224, 453 P.2d 587 (1969); Underwriters at Lloyd's of London v. Hunefeld, 230 Cal.App.2d 31, 40 Cal.Rptr. 659 (1964).

■■■ We are unable to equate everything a jockey does, which promotes his physical fitness to perform and compete successfully as a jockey in a horse race, as "practicing" for riding in a race. We do not believe the average person who knows anything about riding horses and horse racing would consider galloping a horse, as Vic & Vinegar was being galloped, constitutes "practicing" to ride as a jockey in a horse race. This same service of exercising and galloping horses is performed for the same fee by exercise boys who are not jockeys and are not eligible to ride in races as jockeys. Athletes, if they are to compete successfully and perform to the utmost of their potential, must keep physically fit, and this usually requires care in diet, regularity and control of many habits, regulating the intensity of exercises of certain kinds for the development of different parts of the body, etc. However, everything that is done to attain and retain a desired degree of general fitness to perform successfully does not fall within the realm of "practicing" for that performance. We are of the opinion that "practicing," in the sense meant by the language of the policy provision above quoted, means performing the same act or acts required in the successful performance of the athletic or sports exhibition or contest in question, or at least the performance of an act or acts so similar as to develop the particular capacities and skills essential to suc-

cess in that sport or athletic event. Also, the risks and dangers accompanying practice should be the same as those encountered by a participant in an actual contest or exhibition. The purpose of the exclusion is to remove from coverage under the policy those risks which are normally encountered in the participation or practice for participation in the particular sport involved. Compare Fireman's Fund Indemnity Co. v. Hudson Associates, 97 N.H. 434, 91 A.2d 454 (1952). Here the alleged negligence which resulted in Sisneros being thrown was the negligence of defendant in permitting dogs to enter the track and attack Vic & Vinegar while being exercised by Sisneros.

█ An insurance company may properly assume some risks and exempt itself from others, but if the language of the policy is fairly susceptible of different interpretations, the one most favorable to the insured should be adopted. Black Hills Kennel Club v. Fireman's Fund Indem. Co., 77 S.D. 503, 94 N.W.2d 90 (1959). See also Foundation Reserve Insurance Co. v. McCarthy, supra; Couey v. National Benefit Life Insurance Company, supra.

There is no merit to the claim that Sisneros may have been exercising Vic & Vinegar in order to familiarize himself with the horse's characteristics. He had never ridden her in a race and was not scheduled to do so. In any event, riding her at a gallop purely for the purpose of exercising her did not convert any hope he might have entertained to some day ride her in a race into practicing for that possible eventuality.

As we understand plaintiff's arguments, no contention is made, that because Sisneros may have exercised and galloped Vic & Vinegar for reasons (3) and (4) above stated, he was thereby "practicing" for participation in a horse race. In any event, we are unable to see how exercising and galloping a horse for a fee, or for the good will or favor of the horse's trainer, could have any bearing upon whether or not such conduct on his part amounted to "practicing" for a horse race to be sponsored by defendant.

Under the facts of this case, we are of the opinion that no genuine issue of fact exists as to whether Sisneros came within the policy exclusion at the time of his injury, and that the trial court correctly granted summary judgment for defendant. In reaching this decision, we have considered and applied the rules followed by this Court in passing upon a motion for summary judgment. For recent decisions announcing and applying these rules see Kalosha v. Novick, 84 N.M. 502, 505 P.2d 845 (1973); Goodman v. Brock, 83 N.M. 789, 498 P.2d 676 (1972); Montoya v. City of Albuquerque, 82 N.M. 90, 476 P.2d 60 (1970); Martinez v. City of Albuquerque, 84 N.M. 189, 500 P.2d 1312 (Ct.App.1972); Smith v. Klebanoff, 84 N.M. 50, 499 P.2d 368 (Ct.App.1972).

The summary judgment should be affirmed.

It is so ordered.

STEPHENSON and MONTOYA, JJ., concur.