**NORTH RIVER INSURANCE COMPANY, Plaintiff,**

v.

**Howard D. HUFF, et al., Defendants.**

**Civ. A. No. 84–2069–S.**

United States District Court, D. Kansas.

Nov. 20, 1985.

Michaela Nicolarsen, Blackwell, Sanders, Matheny, Weary & Lombardi, Overland Park, Kan., John W. Morrison, Steven H. Mora, David L. Weinstein, Karon, Morrison & Savikas, Ltd., Chicago, Ill., for plaintiff.

Lawrence E. Sheppard, Sheppard & Holman, Chtd., Prairie Village, Kan., J. Nick Badgerow, John J. Jurcyk, Jr., Kansas City, Kan., Ronald Barta, Barta & Barta, Salina, Kan., Don W. Noah, Noah & Harrison, Beloit, Kan., Reggie C. Giffin/J. Emmett Logan, Nancy L. Shelledy/P. John Owen, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., A. Bradley Bodamer, Morrison, Hecker, Curtis, Kuder & Parrish, Overland Park, Kan., Richard A. Knudsen, Robert J. Routh, Rodney M. Confer, Knudsen, Berkheimer, Richardson & Endacott, Lincoln, Neb., for defendants.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on motions for summary judgment filed by plaintiff, defendant Huff, defendants Fleming, Erickson and Johnson, and defendant Federal Savings and Loan Insurance Corporation [hereinafter FSLIC]. This is a declaratory judgment action regarding the nature and extent of insurance coverage under a directors' and officers' liability policy, No. FDO 7996.

The uncontroverted facts for the purposes of these motions are as follows. North Kansas Savings Association [hereinafter NKSA] was a savings and loan association insured by the FSLIC. The FSLIC was appointed as receiver for NKSA in November, 1982. In May of 1983, the FSLIC brought an action against nine former directors and/or officers [hereinafter the insureds] in this court, Case No. 83–2169 [hereinafter the underlying action]. The underlying action involves transactions which are alleged to have resulted in losses to NKSA, mainly loans to Grandpa John's, Inc., to the Double Cee Investments Ltd. Syndicate, to Orient Coal Trust II, to Citation, Inc. and its nominees, to Heinz Weimhoff, and to United Development Corporation.

The Grandpa John's, Inc. loan was made on November 4, 1981, in the principal amount of Two Million Two Hundred Seventy Thousand Dollars ($2,270,000). This loan was evidenced by a thirty (30) year note bearing an interest rate of fifteen percent (15%) per annum and was secured by first mortgages on six commercial properties located in the state of Illinois and by the personal guarantees of Mr. and Mrs. Walter L. Luebbert, the principals of Grandpa John's, Inc.

Between August, 1981, and February 12, 1982, NKSA made three loans to Citation, Inc. in the aggregate amount of One Million Eight Thousand Seven Hundred Fifty Dollars ($1,008,750). On June 1, 1982, NKSA made three loans in the aggregate amount of One Million One Hundred Thousand Dollars ($1,100,000) to Louis and Maxine Meyers, Phalen Parkhall's Inc. and Roy Baber. However, these loans were arranged by Citation, the properties purchased with the proceeds of these loans were properties in which Citation had a prior and continuing interest, a portion of the proceeds of these loans was paid directly to Citation, Citation had agreed to repurchase the properties purchased with the proceeds of these loans, Citation had agreed that it would be responsible for the ultimate repayment of these loans and Citation arranged for these loans to be made to its nominees. These Citation loans are evidenced by notes which are secured by first mortgages on real property in Minnesota.

Sometime in September, 1981, defendants Pierce and Eaton discussed with Walter R. Burnett and George M. Croft the possibility of financing by NKSA of a cruise ship to be leased by Double Cee Investments, Ltd. On September 8, 1981, defendants Pierce and Huff caused NKSA to issue an irrevocable One Hundred Thousand Dollar ($100,000) bank guarantee to the owner of the cruise ship proposed to be leased by Double Cee. The board of directors ratified this transaction on September 9, 1981. On October 2, 1981, NKSA wired One Hundred Thousand Dollars ($100,000) to the owner of the cruise ship, and Dr. Croft executed a note without security to evidence the loan. Loans were thereafter made in the amounts of One Hundred Twenty Thousand Dollars ($120,-000) to each of the five members of the Double Cee syndicate. These actions were ratified by the Board of Directors on November 10, 1981. On May 12, 1981, the board authorized refinancing of the previous loans made to the Double Cee syndicate by making loans in the principal amount totaling One Million Dollars ($1,000,000) to ten members of the syndicate. On June 17, 1982, NKSA made a Two Hundred Thousand Dollar loan to Dr. Croft for the purpose of financing the lease of the cruise ship. On June 21, 1982, NKSA refinanced its prior loans to the members of the Double Cee syndicate in the amount of One Million Two Hundred Thousand Dollars ($1,200,000). The loans eventually were secured by a One Million Dollar ($1,000,000) certificate of deposit deposited under an escrow agreement.

On March 9, 1982, NKSA made a loan to Orient Coal Trust II in the principal amount of One Million Two Hundred Thousand Dollars ($1,200,000). This loan was evidenced by a five (5) year note bearing interest at the rate of eighteen percent (18%) per annum, and was secured by a first mortgage on unimproved real property located in the state of Illinois and by the personal guarantees of Richard J. Heath and Maxine P. Zwermann, the beneficiaries of Orient Coal Trust II.

Defendants Pierce and Huff, prior to July 12, 1982, discussed with Heinz Weimhoff, the possibility of his purchase of the inventory of Grandpa John's, Inc. with funds loaned by NKSA. On July 12, 1982, defendant Huff directed defendant Eaton to wire One Hundred Seventy Thousand Dollars ($170,000) of NKSA funds to the trustee of Grandpa John's on Mr. Weinhoff's behalf. Mr. Weinhoff was not required to execute a note or to provide any collateral to secure his indebtedness.

On March 1, 1982, defendant Huff agreed to sell his stock in North Kansas Financial Corporation [hereinafter NKFC] to Thomas W. Woodward, Stephen H. Christian, or both, for Two Million Six Hundred Seventy Thousand Dollars ($2,670,-000). Woodward's obligation to purchase defendant Huff's NKFC stock was conditioned upon NKSA's making an Eleven Million Dollar loan ($11,000,000) to United Development Corporation [hereinafter UDC]. On July 14, 1982, the board of directors of NKSA approved a loan in an amount exceeding Eleven Million Dollars ($11,000,-000) to UDC. This loan was evidenced by a note made by UDC with a term of one (1) year, bearing interest at the rate of eighteen percent (18%) per annum, and was secured by a second mortgage on the Woodward ranch property.

Plaintiff insured certain risks by its directors', officers' and employees' liability insurance, Policy No. FDO 7996, issued September 30, 1982. This policy was a renewal of plaintiff's policy No. FDO 7416, effective from September 30, 1979, to September 30, 1982. Policy No. FDO 7416 declared the limit of liability in terms of a "per incident" basis. Policy No. FDO 7996 describes coverage limits as One Million Dollars ($1,000,000) per year for each director, officer or employee, but not in excess of a total aggregate of One Million Dollars ($1,000,000) per occurrence. Marketing and promotional materials did not identify the change in terminology from "per incident" to "per occurrence." The term incident was not defined in Policy No. FDO 7416. Policy No. FDO 7996 defines "occurrence" as any claim or claims made

involving one or more insured arising out of the same act, interrelated acts, errors, omissions or scheme.

The transactions involving Grandpa John's, Inc., Orient Coal Trust II, UDC/Woodward, and five of the six Citation loans were loan swaps. A loan swap was a triangular transaction involving a buyer of property, a seller and NKSA as the lender. The "swap" worked by the buyers giving to NKSA a note for the loan and NKSA assigning to the seller seasoned mortgage notes which were then exchanged for the buyer's note. Loan swaps were a part of NKSA's loan policy and were intended to be profitable transactions. A loan swap was like any other loan made by NKSA except that mortgage notes instead of cash were used to fund the transaction. NKSA continued to make cash loans during the period of the loan swaps. In addition to the loan swaps which were made, NKSA's officers and directors considered and rejected from six to twelve similar loan swap proposals.

After the filing of FSLIC's action against the insureds and their tenders of defense, plaintiff sent a reservation-of-rights letter to the personal attorneys for each of the insureds. Pertinent language in the reservation letter provides:

... This reservation is required by (1) our lack of information sufficient to assess the captioned claim and determined [sic] the extent, if any, to which coverage is afforded by Policy No. FDO 7996; ... and (3) the fact that the complaint filed by the Federal Savings & Loan Insurance Corporation ("FSLIC") seeks a joint and severable recovery against all defendants, ... in excess of the $1,000,000 limit of the captioned policy.

This action was filed on February 17, 1984, and the complaint raised the issue of aggregate limits of coverage versus multiple coverages. On April 16, 1985, plaintiff conceded that for the purposes of this action, Policy No. FDO 7996 provided multiple coverages.

To rule favorably on a motion for summary judgment, the court must first determine that the matters considered in connection with the motion disclose "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. The principal inquiry is therefore whether a genuine issue of material fact exists. *Dalke v. The Upjohn Co.*, 555 F.2d 245 (9th Cir.1977); *Hanke v. Global Van Lines, Inc.*, 533 F.2d 396 (8th Cir.1976). A motion under Rule 56 will be denied unless the movant demonstrates beyond doubt that he is entitled to a favorable ruling. *Madison v. Deseret Livestock Co.*, 574 F.2d 1027 (10th Cir.1978); *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33 (10th Cir.1975). Pleadings and documentary evidence are to be construed liberally in favor of a party opposing a Rule 56 motion. *Harman v. Diversified Medical Investments Corp.*, 488 F.2d 111 (10th Cir.1973), *cert. denied* 425 U.S. 951, 96 S.Ct. 1727, 48 L.Ed.2d 195 (1976). However, once a summary judgment motion has been properly supported, the opposing party may not rest on the allegations of the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Coleman v. Darden*, 595 F.2d 533, 536 (10th Cir.), *cert. denied* 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979). A party with evidence tending to create a factual issue must present that evidence to the trial judge or summary judgment is proper. *Otteson v. United States*, 622 F.2d 516, 520 (10th Cir. 1980).

The parties have raised many of the same or related issues in their respective briefs, and the court will consider the arguments by their subject matter rather than in terms of a particular motion.

■ Defendant FSLIC argues that Policy No. FDO 7996 must be construed to provide coverage on a "per incident" basis. This argument is based on the contention that an ambiguity exists in the renewal application which bases coverage on a "per incident" basis while the policy provides for coverage on a "per occurrence" basis. De-

fendant argues that the ambiguity should be resolved in favor of the insureds and the coverage should be found to be on the less restrictive "per incident" basis. Defendant also argues that an attempted reduction in coverage should be conspicuously stated to be effective.

The court finds these arguments unpersuasive in that there is virtually no difference in the coverage provided under either policy. Policy No. FDO 7416 speaks in terms of "per incident" but still limits its coverage to One Million Dollars ($1,000,-000) for claims arising out of the same act or interrelated acts. This is the same coverage provided in Policy No. FDO 7996 on a "per occurrence" basis.

Additionally, the court would note that the terms "incident" and "occurrence" are synonomous and can be used interchangeably. See *Webster's New Collegiate Dictionary*, p. 788 (1979). The court is aware of no Kansas case to the contrary.

█ The next dispute centers on the number of occurrences which arise from the FSLIC's allegations in the underlying action. Policy No. FDO 7996 defines occurrence as "any claim or claims made involving one or more insured arising out of the same act, interrelated acts, errors, omissions or scheme." Plaintiff alleges that the underlying action is based on three occurrences in that the four loan swaps were all part of one loan swap program and therefore constitute only one occurrence. Defendants dispute this allegation and contend that the underlying action involves six occurrences, in that each loan was a "occurrence" in its own right.

The court is aware of no Kansas case which has addressed the issue of determining the number of occurrences in the context of a policy of insurance. The United States District Court for the District of Hawaii considered a similar problem in *Okada v. MGIC Indemnity Corp.*, 608 F.Supp. 383 (D.Hawaii 1985). In that case, the court considered the number of occurrences covered under a directors' and officers' insurance policy. The alleged negligent acts included voting at separate times

to include spot loans to home buyers, authorizing five separate, unrelated large condominium project loans, and ordering the move and rennovation of corporate headquarters without having sufficient funds. The court found that the failure of the savings institution was not in itself a loss but was caused by one or more separate financial losses over time. The court determined the losses described above were separate and unrelated to each other. Further, these separate acts did not form part of a series of similar acts, but were distinct and dissimilar business decisions made by the officers and directors.

In *Appalachian Ins. Co. v. Liberty Mutual Ins. Co.*, 676 F.2d 56 (3rd Cir.1982), the Third Circuit Court of Appeals held that the issue of whether losses were caused by a single occurrence or multiple occurrences is determined by reference to the cause of the loss. Under this analysis, the court must determine whether there was one proximate, uninterrupted and continuing cause which resulted in all of the injuries and damage. The Tenth Circuit Court of Appeals also considered the cause theory in *Business Interiors, Inc. v. Aetna Casualty & Surety Co.*, 751 F.2d 361 (10th Cir.1984). The court therein found that the acts of a dishonest employee who forged or materially altered forty checks constituted a single loss under the insurance policy. The court reasoned that the probable intent of the employee was to continue the dishonesty rather than to commit entirely new acts of dishonesty.

In the case at bar, the court cannot agree with plaintiff's contention that the Grandpa John's, Inc., Orient Coal Trust II, United Development Corporation and Citation loans constituted only one occurrence. Although these transactions involve the same method of financing the loans, that being through a loan swap, each was a separate loan transaction. These transactions occurred at separate times, involved different borrowers, were for different purposes, and had separate collateral. The loans funded by the loan swaps cannot be found to be interrelated. The decision to institute

the loan swap program did not cause any damage, rather it was the alleged negligence on the part of the insureds in making or approving unprofitable loans. Therefore, each of these loans constitutes a separate occurrence under the policy.

The next issue before the court is that of waiver on the part of plaintiff by failing to specify its reservation-of-rights in this case. Defendants argue that plaintiff has relied on one explicit policy limitation, that an aggregate amount of One Million Dollars ($1,000,000) in coverage existed, until it was forced to abandon that position. Defendants assert that plaintiff has failed to timely assert any other coverage defenses and should be estopped from raising any additional matters.

■■■ A liability insurer which assumes the defense of an action against the insured may save itself from the defense of waiver or estoppel if it clearly disclaims liability under the policy and gives notice of its reservation of a right to set up the defense of non-coverage. *Snedker v. Derby Oil Co., Inc.*, 164 Kan. 640, 192 P.2d 135 (1948). See also *Henry v. Johnson*, 191 Kan. 369, 381 P.2d 538 (1963). "Where an insurer bases its refusal to pay a loss upon a forfeiture or failure to comply with [a] particular condition it cannot thereafter maintain a defense based upon another condition not referred to in such refusal to pay and of which it then had knowledge." *Pacific Indemnity Co. v. Berge*, 205 Kan. 755, 767, 473 P.2d 48, 57 (1970). An insurer cannot handle a claim with knowledge of policy defenses indefinitely and must inform its insured of its disclaimer within a reasonable time. 7C Appleman, *Insurance Law and Practice* § 4694, p. 361 (1979). Additionally, notice to an insured is insufficient unless it makes specific reference to the policy defense being relied upon by the insurer. *Id.* at 353. Filing a declaratory judgment action is a suitable alternative to the filing of a reservation of rights. *Id.* at § 4692.

■■ In the instant case, plaintiff sent reservation-of-rights letters to the insureds in June of 1983. These letters stated: "This reservation is required by (1) our lack of information sufficient to assess the captioned claim and determined (sic) the extent, if any, to which coverage is afforded by Policy No. FDO 7996; ... and (3) the fact that the complaint filed by the Federal Savings & Loan Insurance Corporation ("FSLIC") seeks a joint and severable recovery against all defendants ... in excess of the $1,000,000 limit of the captioned policy." Plaintiff thereafter filed this declaratory judgment action on February 17, 1984, seeking a declaration that an aggregate limit of One Million Dollars ($1,000,000) in coverage existed. The underlying case has been pending for over two years, and plaintiff has had ample time to evaluate the extent of its coverage in this matter. The allegations framed by the FSLIC in the underlying case should have alerted plaintiff as to any possible defense on the basis of fraud. Further, plaintiff could have asserted the defense based on misrepresentation at an earlier time as it was in possession of the renewal application and aware of the Federal Home Loan Bank Board's report since August of 1984. Plaintiff has failed to assert its defenses within a reasonable time and it is now estopped to do so.

Defendants next assert the issue of plaintiff's due care and good faith. The factors to consider in making this determination are:

... [1] the strength of the injured claimant's case on the issues of liability and damages; [2] attempts by the insurer to induce the insured to contribute to a settlement; [3] failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured; [4] the insurer's rejection of advice of its own attorney or agent; [5] failure of the insurer to inform the insured of a compromise offer; [6] the amount of financial risk to which each party is exposed in the event of a refusal to settle; [7] the fault of the insured in

inducing the insurer's rejection of the compromise offer by misleading it as to the facts; and [8] any other factors tending to establish or negate bad faith on the part of the insurer.

*Bollinger v. Nuss,* 202 Kan. 326, 338, 449 P.2d 502, 512 (1969), *quoting Brown v. Guarantee Ins. Co.,* 155 Cal.App.2d 679, 689, 319 P.2d 69, 75 (1958).

The court has carefully reviewed the record on this issue and finds that material fact questions exist, therefore it is not proper for resolution by summary judgment at this juncture.

■ Defendants Huff, Fleming, Erickson and Johnson seek attorneys' fees as provided for in the contract of insurance which states, "[t]he company shall pay the insureds for all reasonable expenses other than salaries, wages and loss of earnings incurred at the company's request...." *Upland Mutual Ins., Inc. v. Noel,* 214 Kan. 145, 519 P.2d 737 (1974), addressed a similar situation and found that an insured could recover attorneys' fees incurred in the defense of a declaratory judgment action brought by the insurer. The court found that the filing of a declaratory judgment action constituted a "request" on the part of the insurer and therefore the company was obligated under the terms of its policy to reimburse its insured. Likewise, in the case at bar, plaintiff should be liable for fees incurred in this action under its contract of insurance.

IT IS BY THE COURT THEREFORE ORDERED that plaintiff's motion for summary judgment is hereby denied. IT IS FURTHER ORDERED that defendant Huff's motion for summary judgment is hereby denied in part and granted in part. IT IS FURTHER ORDERED that the motion of defendants Fleming, Erickson and Johnson for summary judgment is hereby denied in part and granted in part. IT IS FURTHER ORDERED that the motion of defendant FSLIC for summary judgment is hereby denied in part and granted in part.