[No. S023292. Aug. 12, 1993.]

BAY CITIES PAVING & GRADING, INC., Plaintiff and Respondent, v. LAWYERS' MUTUAL INSURANCE COMPANY, Defendant and Appellant.

---

## COUNSEL

Richard Amerian, Phillips, Greenberg, Dolven & Strain, Aaron M. Greenberg, Esner, Marylander & Zakheim, Stuart B. Esner, Grant Marylander and Rosalyn S. Zakheim for Defendant and Appellant.

Musick, Peeler & Garrett, R. Jospeh De Briyn, Harry W. R. Chamberlain II, Adams, Duque & Hazeltine, Richard T. Davis, Jr., Andrew J. Waxler, Jill Baran Scott, Gibson, Dunn & Crutcher, John L. Endicott, Scott R. Hoyt, Deborah A. Aiwasian, Meyers, Bianchi & McConnell, Martin E. Pulverman, Jeffrey M. Cohon and Lawrence P. House as Amici Curiae on behalf of Defendant and Appellant.

Arthur R. Abelson for Plaintiff and Respondent.

---

## OPINION

**BAXTER, J.**—A general contractor was owed money for its work on a construction project. The attorney who had been representing the contractor in connection with the project recorded a mechanic's lien but thereafter failed to serve a stop notice on the project's construction lenders and failed to file a complaint to foreclose the mechanic's lien. As a result of the attorney's omissions, the contractor was unable to collect the amount it was owed.

The contractor then commenced this action against its attorney. The attorney's professional liability insurance policy contains a provision limiting coverage to a maximum of $250,000 "for each claim" and further provides that, "Two or more claims arising out of a single act, error or omission or a series of related acts, errors or omissions shall be treated as a single claim."

The narrow issue before us is one of first impression. Does the policy's $250,000 per claim limit apply to the attorney's two omissions? We hold the limitation applies for two independent reasons: (1) The contractor's suit against its former attorney is a single claim within the meaning of the

insurance policy's definition of "claim." (2) Even if the contractor's action could be viewed as comprising two claims within the policy definition, those claims must be treated as a single claim under the policy's provision limiting coverage for claims arising out of a series of related acts, errors, or omissions.

## FACTS

The facts are few and undisputed. Respondent Bay Cities Paving & Grading, Inc. (Bay Cities), a licensed general contractor, retained Attorney Robert Curotto to represent Bay Cities in connection with construction work it was performing. Bay Cities completed its work on the project but was unable to collect a substantial portion of the amount it was owed. Curotto filed a mechanic's lien on Bay Cities' behalf. Curotto, however, did not serve a stop notice on the project's construction lenders. Nor did he timely seek to foreclose the mechanic's lien.

Bay Cities sued Curotto for legal malpractice, alleging that he had been negligent in failing to serve a stop notice and in failing to foreclose the mechanic's lien. Curotto tendered the defense of the action to his professional liability insurance carrier, appellant Lawyers' Mutual Insurance Company (Lawyers' Mutual).

Curotto, Bay Cities, and Lawyers' Mutual stipulated as follows: Coverage under the Lawyers' Mutual policy issued to Curotto was limited to $250,000 per claim and an annual aggregate of $750,000. Bay Cities contended it was asserting two separate claims within the meaning of the policy and that the limit of coverage was therefore $500,000. Lawyers' Mutual contended that only one claim was being asserted. Lawyers' Mutual would pay Bay Cities $250,000, and the parties would try before the court the issue of whether two claims were being asserted within the meaning of the policy. If the court found there was only one claim, Bay Cities' recovery would be limited to the $250,000 stipulated payment. If the court found there were two claims, Bay Cities could recover additional damages up to a maximum of $187,000. Pursuant to the stipulation, Curotto was dismissed from the action, and Lawyers' Mutual was designated as the defendant.

The trial court ruled that Curotto had committed two acts of legal malpractice that were *not* related under the terms of the policy: (1) the failure to file a stop notice, and (2) the failure to file a timely action to foreclose the mechanic's lien. Bay Cities was awarded $169,000 in addition to the $250,000 already paid under the stipulation.

Lawyers' Mutual appealed. The Court of Appeal affirmed, holding that: (1) each of Curotto's two errors gave rise to a separate claim under the

policy, and (2) the two claims are not "related" within the meaning of the policy.

DISCUSSION

I. *Meaning of "claim" under the policy*

The attorney's liability policy states, " 'Claim' whenever used in this policy means a *demand*, including service of suit or institution of arbitration proceedings, *for money against the insured*." (Italics added.) By any reasonable understanding, Bay Cities' suit against Curotto is a demand for money. Bay Cities does not contend otherwise. Rather, the dispute is centered on the policy's "Limits of Liability" section. It states, *"The liability of the company* under subsection 1 of the section of this policy entitled 'The Coverage' *for each claim* FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD *shall not exceed the amount stated in the Declarations for 'each claim . . . .' "* (Italics added.) ▮▮ Bay Cities contends it is asserting two separate claims, each of which is subject to the per-claim limit of $250,000, because each of Curotto's two omissions resulted in a separate injury to Bay Cities. Lawyers' Mutual contends there is a single claim. The parties have stipulated that the pertinent portion of the policy is paragraph 3 of the policy's "Limits of Liability" section. It states: "The inclusion herein of more than one Insured or the making of claims or the bringing of suits by more than one person or organization shall not operate to increase the Company's limit of liability. *Two or more claims arising out of a single act, error or omission or a series of related acts, errors or omissions shall be treated as a single claim.*" (Italics added.) As we shall explain, Lawyers' Mutual has the better view. Bay Cities has a single claim under the policy.

In concluding two claims are presented, the Court of Appeal rejected Lawyers' Mutual's argument there is only one claim because there is only one lawsuit. The court's premise was that, "There are two distinct causes of action and the fact that they are included within one lawsuit should not be the deciding factor." We agree with the Court of Appeal's view that including multiple claims within a single action does not render them a single claim. That conclusion, however, begs the question of whether there is more than one claim in the first instance. The Court of Appeal erred on that threshold question by starting with the underlying premise that Bay Cities was asserting two causes of action. We do not suggest that the number of claims is determined by rules of pleading. A correct understanding, however, of the nature of a "cause of action" does shed light on the question before us.

Bay Cities was not asserting two causes of action. Bay Cities had a single injury and thus a single cause of action against its attorney.[1] "California has consistently applied the 'primary rights' theory, under which the invasion of one primary right gives rise to a single cause of action." (*Slater* v. *Blackwood, supra,* 15 Cal.3d 791, 795; *Big Boy Drilling Corp.* v. *Rankin* (1931) 213 Cal. 646, 649 [3 P.2d 13]; 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 23, pp. 66-67.) Bay Cities had one primary right—the right to be free of negligence by its attorney in connection with the particular debt collection for which he was retained. He allegedly breached that right in two ways, but it nevertheless remained a single right.

Similarly, "[T]he 'cause of action' is based upon the harm suffered, as opposed to the particular theory asserted by the litigant. . . . Even where there are multiple legal theories upon which recovery might be predicated, *one injury* gives rise to only one claim for relief." (*Slater* v. *Blackwood, supra,* 15 Cal.3d 791, 795, italics added.) Bay Cities suffered a single injury as a result of its attorney's omissions—the inability to collect the amount owed to Bay Cities for its work on the construction project.

In *Big Boy Drilling Corp.* v. *Rankin, supra,* 213 Cal. 646, 649, we considered the concept of a "cause of action" in connection with a contractor's efforts (through its assignee) to recover money owed for work done on real property. "Whether plaintiff accomplishes this purpose by the foreclosure of mechanics' liens or by way of a personal judgment, or both, is immaterial. Both demands having arisen out of the same transaction, there is but one cause of action with two forms of relief. The seeking of different kinds of relief does not establish different causes of action. . . . The 'cause of action' is to be distinguished from the 'remedy' and the 'relief' sought, for a plaintiff may frequently be entitled to several species of remedy for the enforcement of a single right." (*Big Boy Drilling Corp.* v. *Rankin, supra,* 213 Cal. 646, 649 [citations omitted].)

The reasoning as to proper pleading, though not controlling, is illustrative in the present case. Bay Cities contends it had two sources of payment of its construction work: (1) foreclosure of the mechanic's lien, and (2) serving a timely stop notice on the project's construction lenders. These two procedures, however, arose from the same transaction—Bay Cities' work on the project—and were merely different remedies for nonpayment of the amount

---

[1]Apparently, the Court of Appeal confused the concept of a "cause of action" with that of pleading "counts," which are merely ways of stating the same cause of action differently. We have previously noted that the two terms are often used imprecisely and indiscriminately. (*Slater* v. *Blackwood* (1975) 15 Cal.3d 791, 796 [126 Cal.Rptr. 225, 543 P.2d 593].)

owed to Bay Cities. Thus, Bay Cities had a single right—the right to payment for its construction. The loss of that right as a result of the attorney's two omissions resulted in a single injury.

We find it difficult to imagine how the loss of or damage to a single right could give rise to more than one claim under an attorney's professional liability policy. We need not speculate, however, as to whether or how such an unusual circumstance might arise because the least that can be said is that—when, as in this case, a *single* client seeks to recover from a *single* attorney alleged damages based on a *single* debt collection matter for which the attorney was retained—there is a *single* claim under the attorney's professional liability insurance policy.

Other factors, primarily the policy language and context, lead to the same conclusion. As noted above, the relevant policy language states that, "The inclusion herein of more than one Insured or the making of claims or the bringing of suits by more than one person or organization shall not operate to increase the Company's limit of liability. Two or more claims arising out of a single act, error or omission . . . shall be treated as a single claim." Under this language, if an attorney's single error harmed two clients and gave each of them a separate claim, those two claims would be treated as a single claim under the policy's limitation of liability. It would be anomalous to limit liability in that circumstance but to disregard the limitation when, as in this case, a single client suffers a single injury as a result of multiple errors.

Under Bay Cities' view, the greater the number of an attorney's negligent acts, the greater the number of claims under the policy, even if all the acts cause only a single injury. Such a rule would have the plainly undesired result of providing the attorney who has made one error with an incentive to then make as many additional errors and omissions as possible, so as to increase the amount of insurance coverage.

Moreover, allowing a client to assert multiple claims under the policy would create a serious potential of prejudice to the attorney and to other clients. The professional liability policy in this case, like most such policies, has two independent coverage limitations. One is the per-claim limitation. The other is an aggregate limitation that applies regardless of the number of claims submitted during the policy period. If a particular client could obtain increased coverage by creating multiple claims for a single injury, less coverage would remain for other clients with claims against the attorney. That result could prejudice those clients. Conversely, the attorney could also

be prejudiced because of an increased risk that the attorney's personal, noninsurance assets would have to be used to pay those clients' claims.

The multiplication of claims could prejudice the attorney in another material respect. This and other professional liability policies contain a "deductible," that is, a requirement that the insured bear a portion of the liability "[w]ith respect *to each claim*." (Italics added.) The amount of the deductible can be significant. If a client could assert multiple claims based on a single injury, the attorney would be responsible for multiple deductibles, corresponding to the number of claims. Indeed, in some cases, insurers have contended that multiple claims were being presented, so as to increase the amount of the insured's deductible and thereby decrease the amount owed by the insurer. (*Combined Communications Corp.* v. *Seabord Sur. Co.* (9th Cir. 1981) 641 F.2d 743, 744.) Such result is obviously not favorable to the insured. It also works to the disadvantage of the insured's client because the insurer is responsible for a smaller portion of the damages, and the client must therefore attempt to obtain satisfaction from the attorney's other assets.[2] Courts have generally rejected insurers' attempts to apply multiple deductibles to single claims or related claims by third parties against insureds. (*Beaumont-Gribin-Von Dyl Management Co.* v. *California Union Ins. Co.* (1976) 63 Cal.App.3d 617 [134 Cal.Rptr. 25]; *Haerens* v. *Commercial Cas. Ins. Co.* (1955) 130 Cal.App.2d Supp. 892 [279 P.2d 211]; see generally Annot., Liability Insurance: What Is "Claim" Under Deductibility-Per-Claim Clause (1988) 60 A.L.R.4th 983, 987.) By parity of reasoning, the artificial multiplication of claims should not result in increased coverage. To construe a policy provision narrowly so as to find only one claim and thus limit the deductible, but to construe the same language expansively so as to find multiple claims and thereby increase coverage, would be a result-oriented approach we decline to follow.

Bay Cities contends, "[I]t is almost the universal rule that in analyzing *coverage issues, the courts look to the number of causes* of damage as opposed to the number of *injuries* sustained." Such a principle *is* often stated.

---

[2]At first blush, it might seem odd for an insurer to contend that a particular case presents multiple claims because doing so could increase the amount of coverage. Whether an insurer would choose to do so would depend on the facts of each case, but, as prior cases illustrate, a finding of multiple claims can benefit the insurer and disadvantage the insured and the client. For example, assume that a client obtains a judgment for $25,000 in damages against the attorney, the per claim limitation is $100,000, and the per claim deductible is $5,000. If there is only one claim, the client is entitled to receive $25,000—$20,000 from the carrier and $5,000 from the attorney. If, however, the case is construed as presenting two claims, the client remains entitled to the same amount, $25,000, but the insurer is obligated only to pay $15,000, and the attorney is responsible for twice as much, $10,000. As explained above, this result works against both the insured and the client.

(*Michigan Chemical Corp.* v. *American Home Assur. Co.* (6th Cir. 1984) 728 F.2d 374, 379.) Its application and effect, however, do not support Bay Cities. When there is a single cause of multiple injuries (or a number of causes that result in a greater number of injuries), courts often look to the cause rather than the injuries in determining the amount of insurance coverage. In such a case, the result is a finding of only one claim, i.e., the court looks to the single cause rather than to the multiple injuries. Under Bay Cities' view, the converse of this rule should apply so that, when there are multiple causes of a single injury, the number of causes should determine the number of insurance claims. In other words, Bay Cities proposes we convert a principle that generally limits coverage into one that expands coverage. We decline to do so, at least in the circumstances before us.

The rule proposed by Bay Cities would have little logical or practical consistency and would be unworkable. For example, assume a policy with a $250,000 per-claim limitation, and that the client retains the attorney, as in the present case, to collect a debt of $1 million from a third party. The attorney commits a single error that results in loss of the debt. The client has been damaged in the amount of $1 million, and under Bay Cities' view, is limited to recovery of $250,000 because there was a single cause of the injury. If, however, a different client (or even the same client) lost a debt in the same amount ($1 million) because the attorney committed *three* errors, the recovery would be $750,000 (three errors times $250,000). The point is obvious. Under Bay Cities' rule, clients with the same injuries in the same amount would receive different recoveries based solely on the fortuity of how many errors the attorney commits.

A brief review of the primary cases on which Bay Cities relies further demonstrates why Bay Cities' proposed rule does not apply in this case. In *Michigan Chemical Corp.* v. *American Home Assur. Co., supra,* 728 F.2d 374, a chemical manufacturer, which produced both a livestock feed supplement and a toxic flame retardant, had erroneously shipped the flame retardant rather than the feed supplement to a feed distributor. (Apparently the bags were mislabelled.) The distributor mixed the toxin with regular feed and sold the resulting product to farmers. Thousands of head of livestock became ill and had to be destroyed. The farmers filed suit. The manufacturer contended that each action against it constituted a separate "occurrence" under its liability insurance policies. The insurers contended there was only one occurrence, the accidental shipment of the wrong chemical. Applying Illinois law, the court agreed with the insurer, explaining, "[T]he number of occurrences must be determined by examining the cause of the property damage, *i.e.*, the mis-shipment or mis-shipments of PBB [the toxin]." (*Id.*, at

p. 382.) The court remanded the action to the trial court to determine the number of misshipments.

Similarly, in *Home Indem. Co.* v. *City of Mobile* (11th Cir. 1984) 749 F.2d 659, more than 200 claims were filed against a city for flood damages incurred during 3 rainstorms. The claimant property owners alleged the city had been negligent in its planning, construction, and operation of its water drainage system. The city contended each claim against it constituted a single occurrence in applying its insurance policy's per-occurrence limitation. The insurer contended each storm was a separate cause of the damage and that there were only three occurrences. Applying Alabama law, the court agreed with the insurer that the number of causes, not the number of injuries, was determinative and that each discrete act or series of acts causing damage was a separate occurrence under the policy. (*Id.*, at p. 663.)[3]

*Michigan Chemical Corp.* v. *American Home Assur. Co.*, *supra*, 728 F.2d 374, and *Home Indem. Co.* v. *City of Mobile*, *supra*, 749 F.2d 659, illustrate why Bay Cities' proposed rule does not properly apply in this case. First and foremost, those cases were decided under "occurrence" polices rather than "claims-made" policies. Bay Cities asserts without analysis that the type of policy should make no difference in our analysis. Not so. The language of the occurrence policies at issue in those cases was significantly different from the relevant provision in this case.[4] Indeed, after noting the general rule that a per-occurrence limitation is determined on the basis of the number of occurrences, i.e., the number of causes, rather than on the number of injuries, the *Michigan Chemical* court, *supra*, 728 F.2d 374, explained: "The definitions of 'occurrence' in the present insurance policies reflect this approach. First, these provisions in essence refer to an 'accident' which results in injury during the policy period. The language makes the accident constituting the occurrence logically distinct from the injuries which later take place. *Second, the insurance policies under review afford coverage on an 'occurrence' rather than on a 'claim' basis.* The use of the former term 'indicates

---

[3]In the third case cited by Bay Cities on this point, the dispute was between two insurers for an attorney, one which had issued an "occurrence" policy, and the other which had subsequently issued a "claims-made" policy. The question was which insurer was liable for the claim against the attorney. There was no issue as to the amount of coverage, and the court explained that the "cause v. injury" test, advocated by Bay Cities, did not apply. (*American Home Assur. Co.* v. *Dykema, Gossett, et al.* (7th Cir. 1987) 811 F.2d 1077, 1084.) The case is thus inapposite and provides no support for Bay Cities.

[4]For example, one of the policies in *Michigan Chemical Corp.* v. *American Home Assur. Co.*, *supra*, 728 F.2d 374, stated: "The term 'Occurrence' wherever used herein shall mean *an accident or a happening or event* or a continuous or repeated exposure to conditions *which unexpectedly and unintentionally results in* personal injury, *property damage* or advertising liability *during the policy period.*" (*Id.*, at p. 378, italics in original.) The other policy contained substantially identical language. (*Ibid.*)

that the polic[ies were] not intended to gauge coverage on the basis of individual accidents giving rise to claims, but rather on the underlying circumstances which resulted in the claim[s] for damages.' " (*Id.*, at p. 379, italics added and bracketed material in original, quoting *Champion International Corp.* v. *Continental Casualty Co.* (2d Cir. 1976) 546 F.2d 502, 505-506.) We agree that the respective foci of "occurrence" and "claims-made" policies are different in the present context.[5]

Bay Cities also relies on *Transamerica Ins. Co.* v. *Keown* (D.N.J. 1978) 451 F.Supp. 397, in which an attorney acting as the trustee of an estate had been found liable to its beneficiaries for having breached the trust agreement by investing in real estate. The beneficiaries contended each year the attorney held the real estate gave rise to a separate claim. His insurer contended there was a single claim. The court agreed and noted that other decisions had been based on "whether the court focuses on cause or effect." (*Id.*, at p. 403.) The *Keown* court then explained there was a single cause in that case. Based on that alone, Bay Cities cites the decision as supporting the "cause v. injury" test it espouses. Bay Cities reads too much into *Keown.* Properly understood, it supports our view. The *Keown* court, like us, looked to the injury. "The effect is also singular; one piece of real estate lost value to the detriment of a single estate." (*Ibid.*) The same logic applies here. To paraphrase *Keown,* "The effect is singular; one debt was lost to the detriment of one client."

As shown, the cases on which Bay Cities relies are largely distinguishable because they were decided under different policy language (in most cases, "occurrence" policies), different states' approaches to insurance policy construction, and different fact situations. Moreover, the "cause" approach resulted in a restriction of coverage, not the expansion Bay Cities seeks.

---

[5]In *Beaumont-Gribin-Von Dyl Management Co.* v. *California Union Ins. Co., supra,* 63 Cal.App.3d 617, the court decided that claims asserted by multiple third parties against a property management company constituted a single claim for purposes of computing the amount of the deductible under the company professional liability policy. Although this result is consistent with our view in this case, Bay Cities nevertheless cites the decision for its statement that, "[T]he label, whether 'claims made' or 'occurrence,' applied to an insurance policy is of little aid in its interpretation." (*Id.*, at p. 624.) In the context of the question before that court, the observation may have been accurate. As explained in one of the cases cited by Bay Cities, however, the two types of policies are notably different in some respects, most importantly, the period for which they provide coverage. (*Chamberlin* v. *Smith* (1977) 72 Cal.App.3d 835, 845, fn. 5 [140 Cal.Rptr. 493].) Otherwise, there would be no need for or use of both types of policies. Depending on the question before a court, the type of policy— "claims-made" or "occurrence"—can be significant to the outcome. To the extent that it suggests otherwise, we disapprove of the statement in *Beaumont-Gribin-Von Dyl Management Co.* v. *California Union Ins. Co., supra,* 63 Cal.App.3d 617, 624.

For all the foregoing reasons, we hold that Bay Cities has a single claim against its attorney within the meaning of the professional liability insurance policy issued by Lawyers' Mutual.

II. *"Related" acts, errors, and omissions*

In light of its conclusion that there were two claims under the policy, the dispositive issue before the Court of Appeal then became whether they were "related" under the policy. Perhaps for that reason, most of the Court of Appeal's opinion dealt with the meaning of "related" as a policy term. Similarly, the parties' briefs in this court also emphasize that issue. We therefore address that question as well.

 Even if we were to view each of the attorney's two omissions as giving rise to a separate claim by Bay Cities, the per-claim limitation nevertheless would apply. The policy states, "Two or more claims arising out of a single act, error or omission or *a series of related acts, errors or omissions* shall be treated as a single claim." (Italics added.) The Court of Appeal deemed the term "related" to be ambiguous, construed it to mean only errors that are causally related to one another, and concluded this provision does not apply because neither of the attorney's two errors caused the other error. As we shall explain, the Court of Appeal's analysis and conclusion are flawed in several respects.

The Court of Appeal assumed an ambiguity merely because, ". . . no definition was provided [in the policy] for the term 'related,' " and reasoned that "The lack of definition [of 'related'] allows for ambiguity with respect to the 'Limits of Liability' clause." The absence from the policy of a definition of the term "related" does not *by itself* render the term ambiguous. We recently rejected the view that the lack of a policy definition necessarily creates ambiguity. (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1264-1265 [10 Cal.Rptr.2d 538, 833 P.2d 545]; see also *Castro* v. *Fireman's Fund American Life Ins. Co.* (1988) 206 Cal.App.3d 1114, 1120 [253 Cal.Rptr. 833].) Indeed, any rule that rigidly presumed ambiguity from the absence of a definition would be illogical and unworkable. To avoid the ambiguity perceived by the Court of Appeal, an insurer would have to define every word in its policy, the defining words would themselves then have to be defined, their defining words would have to be defined, and the process would continue to replicate itself until the result became so cumbersome as to create impenetrable ambiguity. The present case illustrates the problem. The insurer contends that "related" means a logical connection, rather than only a causal connection as held by the Court of Appeal. Under the Court of

Appeal's view, the insurer's position could prevail only if it had defined or somehow qualified "related," that is, by using the words "logically related," rather than the unqualified term "related." Of course, the addition of the word "logically" would not remove the ambiguity unless the word "logically" were itself defined in the policy. Every definition would require a further definition. We reject such a result. Of course, in an appropriate case, the absence of a policy definition, though perhaps not dispositive, might weigh, even strongly, in favor of finding an ambiguity, for example, when the term in question has no generally accepted meaning outside the context of the policy itself. The absence from a policy of a definition of a word or phrase does not *by itself,* however, necessarily create an ambiguity.

The proper and settled approach is more refined. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.,* § 1639.) The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*id.,* § 1644) controls judicial interpretation. (*Id.,* § 1638.)" (*AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 821-822 [274 Cal.Rptr. 820, 799 P.2d 1253]; *Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764].) This reliance on common understanding of language is bedrock.

Equally important are the requirements of reasonableness and context. First, "An insurance policy provision is ambiguous when it is capable of two or more constructions both of which are *reasonable.*" (*Suarez* v. *Life Ins. Co. of North America* (1988) 206 Cal.App.3d 1396, 1402 [254 Cal.Rptr. 377], italics added.) "Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." (*Reserve Insurance Co.* v. *Pisciotta, supra,* 30 Cal.3d 800, 807.) Second, "[L]*anguage in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.*" (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th 1254, 1265, original italics, quoting *Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 916, fn. 7 [226 Cal.Rptr. 558, 718 P.2d 920].) "There cannot be an ambiguity per se, i.e. an ambiguity unrelated to an application." (*California State Auto. Assn. Inter-Ins. Bureau* v. *Superior Court* (1986) 177 Cal.App.3d 855, 859, fn. 1 [223 Cal.Rptr. 246].)

Applying the foregoing principles in this case, the first question is whether the term "related" is ambiguous as to the specific issue in this case,

that is, the question of whether the per-claim limitation applies. "Related" is a commonly used word with a broad meaning that encompasses a myriad of relationships. For example, a leading legal dictionary defines "related" to mean "standing in relation; connected; allied; akin." (Black's Law Dict. (6th ed. 1990) p. 1288, col. 1.) Similarly, a legal thesaurus lists many synonyms for "related." (Burton, Legal Thesaurus (1980) p. 925, col. 2.) In a coverage case (not involving a claim limitation), the court observed that "related" can denote a causal connection as well as the "notion of similarity." (*O'Doan* v. *Insurance Co. of North America* (1966) 243 Cal.App.2d 71, 78 [52 Cal.Rptr. 184, 33 A.L.R.3d 684].)

Although "related" is broad enough to encompass both logical as well as causal relationships, the Court of Appeal incorrectly found an inherent ambiguity. Multiple or broad meanings do not necessarily create ambiguity. For example, assume that an insurance policy excluded coverage for any claim arising from the operation of a "motor vehicle." Obviously, a "motor vehicle" could be either an automobile or a truck, but that does not mean it must be only one or the other, rather than both. Likewise here, the fact that "related" can encompass a wide variety of relationships does not necessarily render the word ambiguous. To the contrary, a word with a broad meaning or multiple meanings may be used for that very reason—its breadth—to achieve a broad purpose. We need not, however, belabor the question of whether "related" is ambiguous in the abstract or in some hypothetical circumstance. That is not the question.

The proper question is whether the word is ambiguous in the context of *this* policy and the circumstances of *this* case. (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th 1254, 1265.) "The provision will shift between clarity and ambiguity with changes in the event at hand." (*O'Doan* v. *Insurance Co. of North America, supra,* 243 Cal.App.2d 71, 77.) The linchpin of Bay Cities' argument is that "related" is ambiguous because it could have either a broad meaning, for example, meaning all services rendered by the attorney in connection with this particular matter, or, alternatively, a narrower meaning, that is, only those acts by the attorney that are *causally* related. The precise and narrow question is thus whether "related" in an attorney's professional liability insurance policy is ambiguous because the word is reasonably susceptible to both of these meanings.

We find no ambiguity because the construction of "related" advocated by Bay Cities is not reasonable. If an attorney's error causes one or more other errors, the result is a chain of causation that leads to *an* injury, that is, a single claim. One of the decisions on which Bay Cities relies makes this very

point. "[E]ven though there have been multiple causative acts, there will be a single 'occurrence' if the acts are causally related to each other as well as to the final result." (*Ariz. Prop. & Cas. Ins. Guar. Fund* v. *Helme* (1987) 153 Ariz. 129, 136 [735 P.2d 451, 458, 64 A.L.R.4th 651], italics omitted.) A single claim is, of course, subject to the per-claim limitation of the policy. Similarly, if the chain of causally related events somehow led to two claims (a result difficult to imagine), they would be treated as a single claim under Bay Cities' view of "related," and would be subject to the per-claim limitation. Thus, if the related-acts limitation were applied only to causally related acts, the related-acts limitation would be duplicative of the per-claim limitation.

Moreover, the "causally related" test ignores the nature of the injury. For example, assume an attorney makes two separate omissions during a trial. The attorney fails to object to the admission of an otherwise inadmissible document submitted by the opponent and also fails to produce a key witness on behalf of the client. Each error independently leads to an adverse judgment against the client. Under Bay Cities' analysis, however, there are two claims because neither error caused the other error. If, however, the two claims were causally related, there would be only one claim under the policy. We are not persuaded. Regardless of whether the two errors are independent or causally related, the injury to the client is the same—the adverse judgment. Moreover, when two or more errors lead to the same injury, they are—for that very reason—"related" under any fair and reasonable meaning of the word.

The only attorney malpractice case on which the Court of Appeal relied is largely inapposite and unpersuasive in any event. *Estate of Logan* v. *Northwestern Nat. Cas.* (1988) 144 Wis.2d 318 [424 N.W.2d 179] involved no issue as to the amount of coverage or a per claim limitation. The underlying malpractice suit against the attorney arose out of his failure to file inheritance and estate tax returns for a decedent's estate and negligence in connection with other matters for the estate. The court held that his professional liability insurance policy provided no coverage for failure to file the inheritance and estate tax returns because he was aware when he applied for the policy that he had breached his professional duty as to the tax returns. (*Id.*, at p. 326 [424 N.W.2d at p. 181].) After having failed to file the tax returns, the attorney misplaced them, and he contended this error was a separate act for which he should be covered. The court squarely rejected this contention, holding that the attorney's ". . . initial failure to file and his subsequent misplacement of the tax returns are 'a series of related acts' which must be treated as a single claim." (*Id.*, at p. 344 [424 N.W.2d at p. 188].) The court

noted that, if the attorney had not failed to file the tax returns, he would not have been in a position later to misplace them. The court did not, however, suggest that one error had caused the other.

In a brief paragraph, the *Logan* court, *supra*, 144 Wis.2d 318 [424 N.W.2d 179], also concluded that other negligent acts in connection with the estate were not related to the failure to file the tax returns. The court's reasoning is not entirely clear: "[T]he claim arising out of [the attorney's] negligence in failing to file timely the tax returns and the claims arising out of [his] alleged negligence in failing to file timely the fiduciary returns, to process the auction check, to close the estate, or to manage the cash assets of the estate are not a series of related acts which must be treated as one claim. The duties encompassed in the above claims would have arisen notwithstanding [the attorney's] failure to file the state tax returns in a timely matter." (*Id.*, at p. 345 [424 N.W.2d at p. 189].) Based on this passage, Bay Cities contends the *Logan* court adopted the causally related test advocated by Bay Cities for applying the per-claim limitation. This reads far too much into the decision. It had nothing to do with a per-claim limitation, and the court never explicitly referred to or discussed a causally related test. At most, the decision might be read to suggest that each of the acts of alleged negligence was a breach of a separate duty. We need not decide whether we would agree with the Wisconsin court on the facts of that case, i.e., an estate taxation matter. Moreover, each of the attorney's errors apparently caused separate, identifiable monetary damage to the estate. That fact alone distinguishes *Logan* from the present case, in which the attorney's two errors related to the same debt he was retained to collect. Finally, to the extent the decision might be read broadly (probably more broadly than the court intended) to suggest that every breach of duty in connection with a particular matter necessarily gives rise to a separate insurance claim, we simply disagree. (See discussion at pp. 859-866, *ante.*) In short, *Logan* provides scant, if any, support for Bay Cities.

The other decision on which the Court of Appeal relied is more apposite but nevertheless unpersuasive. In *Ariz. Prop. & Cas. Ins. Guar. Fund* v. *Helme, supra,* 735 P.2d 451 (*Helme*), a state guaranty fund sought to limit its liability for claims against two physicians insured by an insolvent carrier. (For purposes of the coverage action, the fund was subject to the same rights and defenses as the insurer would have been under the policy.) Over a period of time, the two doctors had treated a patient who deteriorated and died. His survivors sued the doctors, alleging that they had repeatedly failed to examine the patient's X-rays or react to his worsening condition. The fund contended the doctors' alleged negligence constituted a single occurrence

under their professional liability policy. (The policy was an "occurrence" policy, rather than a "claims-made" policy as in the present case.) The policy defined "occurrence" as being "any incident, act or omission, or series of *related* incidents, acts or omissions resulting in injury . . . ." (*Id.*, at p. 456, italics added, original italics deleted.) The question was whether the various failures of the doctors constituted a series of "related incidents, acts or omissions" and thus only one occurrence. The court first acknowledged that "related" can mean either a logical or a causal connection. The court concluded, however, that "logic" is a subjective notion, that "causation" is more objective, and therefore that the policy term "related" should be limited to occurrences with a causal connection. (*Id.*, at pp. 456-457.)

For the reasons we have already discussed, we respectfully disagree with the *Helme* court, *supra*, 735 P.2d 451. Nor are we persuaded a "causal connection" is necessarily more precise than a "logical connection," especially in view of the multiple and imprecise meanings of causation. (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1050-1054 [1 Cal.Rptr.2d 913, 819 P.2d 872] [noting the widespread confusion over causation].) More important, our function is not to redraft a policy term merely so that it might be more precise and easier for us to apply.

To support its contention that "related" must mean "causally" related, Bay Cities notes several cases for the proposition that the number of claims is generally determined by the number of causes rather than the number of injuries. This point seems more properly directed to the issue of whether there was one claim or two in the first instance, and we have discussed some of those decisions in connection with that point, explaining why they are either inapposite or unpersuasive. (See discussion at pp. 862-866, *ante*.) As important, however, those cases did not present any issue as to whether claims or occurrences were related. Thus, even in those cases which might be read as holding that the number of causes determines the number of claims or occurrences, those courts did not decide, or even discuss, whether the claims could be "related" under language like that in the policy before us. (*Eureka Federal S & L v. Amer. Cas. Co. of Reading* (9th Cir. 1989) 873 F.2d 229; *Okada v. MGIC Indem. Corp.* (9th Cir. 1986) 823 F.2d 276; *Pioneer Nat. Title Ins. Co. v. Andrews* (5th Cir. 1981) 652 F.2d 439; *North River Ins. Co. v. Huff* (D.Kan. 1985) 628 F.Supp. 1129; *St. Paul Fire & Marine Ins. Co. v. Hawaiian Ins. & Guar. Co.* (1981) 2 Hawaii App. 595 [637 P.2d 1146]; *Hyer v. Inter-Insurance Exchange, etc.* (1926) 77 Cal.App. 343 [246 P. 1055].)

Several of these decisions are also distinguishable for reasons other than the absence of any discussion of the meaning of "related." For example,

three of the cases arose out of errors and omissions of the officers and directors of savings and loan associations that resulted in the associations' insolvency, and the question was whether various acts and omissions leading to the insolvency constituted multiple losses or, alternatively, whether the insolvency itself was the sole loss. The facts of those cases and the nature of the injuries were not similar to the facts of the present case. (*Eureka Federal S & L* v. *Amer. Cas. Co. of Reading, supra,* 873 F.2d 229; *Okada* v. *MGIC Indem. Corp., supra,* 823 F.2d 276; *North River Ins. Co.* v. *Huff, supra,* 628 F.Supp. 1129.) Moreover, the holdings of those cases are not as broad as Bay Cities suggests. As one court explained, "We thus hold that the mere existence of an aggressive loan policy is insufficient as a matter of law to transform disparate acts and omissions by five directors in connection with issuance of loans to over 200 unrelated borrowers into a single loss. We do not foreclose the possibility, however, that loans to separate borrowers may be aggregated as a single loss in an appropriate fact situation." (*Eureka Federal S & L* v. *Amer. Cas. Co. of Reading, supra,* 873 F.2d 229, 235.) Unlike *Eureka,* the present case does not have five defendants committing multiple errors in unrelated loan transactions that injured two hundred clients. We have one defendant, one client, and one injury.

Far more apposite and persuasive is the decision in *Gregory* v. *Home Ins. Co.* (7th Cir. 1989) 876 F.2d 602 (*Gregory*), in which an attorney's liability policy contained a provision like that in the present case: "Two or more claims arising out of a single act, error, or omission or personal injury or a series of related acts, errors, omissions or personal injuries shall be treated as a single claim." (*Id.,* at p. 604, italics omitted.) In connection with the marketing of a videotape investment program, the attorney drafted a "production service agreement" and promissory note for his client, the broker of the videotapes. The attorney also drafted a tax and security opinion letter that his client distributed to prospective buyers of the videotapes. The letter stated that the tapes were not securities that needed to be registered with the Securities and Exchange Commission and that buyers of the tapes would obtain certain tax advantages. The tax and securities advice proved to be incorrect and resulted in actions against the attorney by the investors and by his client.

The *Gregory* court, *supra,* 876 F.2d 602, acknowledged and agreed with the observation in *Helme, supra,* 735 P.2d 451, that "related" can mean both causal and logical connections. "However, we don't think the rule requiring insurance policies to be construed against the party who chose the language requires such a drastic restriction of the natural scope of the definition of the word 'related' [to mean only a causal connection]. . . . At some point, of

course, a logical connection may be too tenuous reasonably to be called a relationship, and the rule of restrictive reading of broad language would come into play." (*Gregory, supra,* 876 F.2d 602, 606, fn. omitted.) Having rejected the causally related test, the *Gregory* court held that claims against the attorney by his client and by the class of investors were a single claim because they "comfortably fit within the commonly accepted definition of the concept [of 'related']." (*Id.,* at p. 606; see also *Home Ins. Co.* v. *Wiener* (N.D.Ill. 1989) 716 F.Supp. 10, 11 (holding that independent errors committed by two attorneys in a firm gave rise to a single claim by the client).)

We agree with the court in *Gregory, supra,* 876 F.2d 602, that the term "related" as it is commonly understood and used encompasses both logical and causal connections. Restricting the word to only causal connections improperly limits the word to less than its general meaning. "Related" is a broad word, but it is not therefore a necessarily ambiguous word. We hold that, as used in this policy and in these circumstances, "related" is not ambiguous and is not limited only to causally related acts.

We do not suggest, however, that, in determining the amount of coverage, the term "related" would encompass every conceivable logical relationship. At some point, a relationship between two claims, though perhaps "logical," might be so attenuated or unusual that an objectively reasonable insured could not have expected they would be treated as a single claim under the policy. In the present case, there is no attenuation or surprise to the insured. The two errors by the attorney are "related" in multiple respects. They arose out of the same specific transaction, the collection of a single debt. They arose as to the same client. They were committed by the same attorney. They resulted in the same injury, loss of the debt. No objectively reasonable insured under this policy could have expected that he would be entitled to coverage for two claims under the policy.

### Disposition

The judgment of the Court of Appeal is reversed with directions to remand this action to the trial court with instructions to enter judgment in favor of appellant Lawyers' Mutual.

Lucas, C. J. Mosk, J. Panelli, J., Arabian, J., and George, J., concurred.

**KENNARD, J.**—I concur in the judgment. In my view, however, much of the discussion in the majority opinion is unnecessary. As I shall explain, the majority interjects a doctrine of civil pleading into an insurance dispute that has nothing to do with pleading. Moreover, the majority reaches out to

decide an issue concerning the scope of "related" acts or omissions under an insurance contract that is superfluous to a resolution of the narrow dispute in this case, and decides the issue in unnecessarily broad terms.

I

This is an insurance case. The question here is whether, when an attorney commits two separate acts of negligence in the same matter that preclude his client's right to recover a single sum against either of two other parties, on either of two legal theories, the attorney's malpractice insurer is liable for only one claim under the policy, or is liable for two claims. The majority determines that under these circumstances the insurer can be liable for only one claim. I agree with the result, but not the reasoning, of the majority opinion.

The majority analyzes the question of whether one or two claims were made under the insurance policy in this case in terms of the "primary rights" doctrine. This doctrine concerns pleadings filed in court. But a claim made under an insurance policy is not the same as a pleading filed in court. Instead, the determination of rights under an insurance policy is a question of *contract law*. (*Mid-Century Ins. Co.* v. *Bash* (1989) 211 Cal.App.3d 431, 436 [259 Cal.Rptr. 382]; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 682, p. 616; Civ. Code, § 1635 ["All contracts, whether public or private, are to be interpreted by the same rules, except as otherwise provided by this code."].) The parties to a contract can define "claim" any way they want. Here, they defined it without reference to the rules of civil pleading.

The parties defined "claim" as "a demand . . . for money against the Insured." This definition can be applied to the facts of this case without reference to pleading doctrines. As the record in this case shows, the former client of the insured, Bay Cities Paving & Grading, Inc., made a demand on the insured attorney, Robert Curotto, through a letter written by new counsel it had retained. The demand letter stated it was asserting "two separate claims," premised on Curotto's two acts of negligence that precluded Bay Cities from recovering from either of two responsible parties. But the demand letter sought payment of a single amount, based on the work performed by Bay Cities on a construction project. Therefore, Bay Cities made a *single* "demand for money against the Insured."

Accordingly, analyzing the main issue in this case without reference to doctrines of pleading, but as a question of contract interpretation, I reach the same result as the majority.

## II

Although the majority concludes that Bay Cities made a single claim, thus resolving the issue on which review was granted, it goes on to discuss at considerable length whether, assuming that Bay Cities had made two claims, the claims would be "related" within the meaning of the policy. This discussion is not only unnecessary to the disposition of the case, but also misleading, as I shall explain.

The pertinent policy language is this: " 'Two or more claims arising out of a single act, error or omission or a series of related acts, errors or omissions shall be treated as a single claim.' " (Maj. opn., *ante*, at p. 866, italics omitted.) The policy does not define the term "related."

Bay Cities argues that the term "related" is ambiguous because it could have a broad meaning—all acts or omissions related in some way—or a narrow meaning of *causally* related. Because the term is not defined in the policy, Bay Cities argues it should be interpreted against the drafting party, in conformance with standard rules of insurance contract interpretation. (1 Witkin, Summary of Cal. Law, *supra*, § 699, p. 632; see *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 821-822 [274 Cal.Rptr. 820, 799 P.2d 1253]; *Universal Underwriters Ins. Co.* v. *Gewirtz* (1971) 5 Cal.3d 246, 250 [95 Cal.Rptr. 617, 486 P.2d 145]; *Gray* v. *Zurich Ins. Co.* (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168].) The majority rejects this argument, saying Bay Cities' interpretation is "not reasonable." (Maj. opn., *ante*, at p. 868.) The majority concludes that "[r]estricting the word ['related'] to only causal connections improperly limits the word to less than its general meaning." (Maj. opn., *ante*, at p. 873.)

I am unconvinced. There are any number of ways in which two acts giving rise to claims under a malpractice insurance policy might be said to be "related" in the general sense of the term. A law firm that has a single policy may commit, through two lawyers, two acts of malpractice affecting the same client on the same day. These claims could be said to be related in at least three ways: temporally (same day), thematically in one sense (same client), and thematically in another sense (two real estate matters involving boundary disputes). Accordingly, the two claims could reasonably be said to be "related" within the "general meaning" of the term. But it is unlikely, given that the acts of malpractice occurred in two separate matters, that the claims would be considered "related" within the meaning of the policy. Thus, the necessity arises to impose some limiting construction on the policy term "related acts or omissions."

When the language of an insurance policy is ambiguous the courts look to the expectations of a reasonable insured. (*American Star Ins. Co.* v. *Insurance Co. of the West* (1991) 232 Cal.App.3d 1320, 1331 [284 Cal.Rptr. 45]; see *AIU Ins. Co.* v. *Superior Court, supra*, 51 Cal.3d at p. 822 [stating that to protect an insured's objectively reasonable expectations, coverage clauses of insurance policies are interpreted broadly].) Here, the context suggests that a reasonable attorney/insured would have thought that under the policy two claims made in the circumstances of this case would be classed as related, but *only* because the element of damages from each was identical and coextensive. Thus, the majority's conclusion that the claims are related within the meaning of the policy is correct, but its endorsement of the policy language "related acts, errors or omissions" as inherently unambiguous is not.

Thus, although the majority has reached the correct result in this case, I cannot subscribe to its reasoning.